## 34690.   LAMAR ELECTRIC MEMBERSHIP CORPORATION *v.* CARROLL.

DECIDED DECEMBER 4, 1953—REHEARING DENIED DECEMBER 17, 1953.

442

448

*Carlton Mobley, Kennedy & Kennedy, Troutman, Sams, Schroder & Lockerman,* for plaintiff in error.

*Jones, Sparks, Benton & Cork,* contra.

*Marshall Pollock, Robert D. Tisinger,* amicus curiae.

QUILLIAN, J. 1. The defendant, plaintiff in error here (hereinafter referred to as the defendant), contends that the petition did not set forth a cause of action because, while it alleged that the trial court had jurisdiction, the facts set forth contradicted this allegation and revealed that as a matter of law the court was without jurisdiction of the defendant; that it was apparent from

the petition that the proper venue of the case was in Lamar County and not in Bibb County. This court recognizes the principle of law that, where the lack of jurisdiction of a court appears upon the face of a petition, it is subject to general demurrer.

The name Lamar Electric Membership Corporation imports an electric-membership corporation chartered under Code (Ann. Supp.) Title 34A. In considering the jurisdiction of the court in this case, all provisions of that act must be taken into consideration. The Rural Electrification Act states that it is complete within itself. However, it contains a provision that the corporations created under it may be empowered to sue and be sued, and does not contain any reference to procedure in such suits. The general rules of practice in this State apply to suits by or against corporations created under this act.

The petition alleges that the defendant is a corporation having its principal office in Lamar County; and, since the suit is filed in Bibb County for injuries sustained in that county, the jurisdiction of the trial court depends upon whether the allegations of the petition show the defendant to be an electric company as defined in § 94-1101 of the Code, the portion of which relating to the venue of actions against electric companies reads as follows: "All . . . electric companies shall be sued by anyone whose person or property has been injured by such . . . electric company, its officers, agents or employees, for the purpose of recovering damages for such injuries, in the county in which the cause of action originated."

It affirmatively appears from the petition that the defendant is a rural electric-membership corporation, and that its charter was granted under what is known as the Electric Membership Corporation Act (Ga. L. 1937, p. 644). Thus the question is whether the corporation as created under that act is an electric company within the contemplation of § 94-1101, so that suits may be brought against them in counties where they injure persons or damage property by the generation of or distribution of electric energy. The defendant (now plaintiff in error), insists that it is not an electric company as defined by § 94-1101, and points out features distinguishing electric-membership corporations from other electric companies created under the general corporation laws of this State. Among these are that corpora-

tions of the former class are exempt from taxation and are not subject to the rules prescribed by the Public Service Commission in reference to electric companies, nor are they required to operate under the supervision of that body.

The fact that electric membership corporations have by our law extended to them privileges and enjoy certain immunities not granted to other corporations does not of itself remove them from the category of electric companies within the definition contained in the Code, § 94-1101. Since the act creating such corporations empowers them to do nothing else but generate and transmit electric energy, and to perform functions incidental thereto, they must be classified as a species of electric companies within the meaning of that Code section.

If these corporations are within the contemplation of the Code section governing suits against electric corporations in the business of generating and transmitting electricity for light, heat, power, or other commercial purposes, the trial court had jurisdiction of the case.

The defendant further insists that, like other corporations created under the Electric Membership Corporation Act, it was created solely for the advancement of the public interest, is a non-profit organization, and is not engaged in business. In this connection the defendant maintains that, while there is some business transacted by it as an electric-membership corporation, it is only incidental and necessary in carrying out the real purpose for which it was created. Under the provisions of that act, the purposes for which Electric Membership Corporations organized under the act are created is stated in Section 3 (Code, Ann. Supp., 34A-103) as follows: ". . . That co-operative, non-profit, membership corporations may be organized under this Act for the purpose of engaging in rural electrification by any one or more of the following methods: (1) The furnishing of electric energy to persons in rural areas who are not receiving electric service from any corporation subject to the jurisdiction of the Georgia Public Service Commission, or from any municipal corporation. (2) Assisting in wiring of the premises of its members or the acquisition, supply, or installation of electrical or plumbing equipment therein. (3) The furnishing of electric energy, wiring facilities, electrical or plumbing equipment or services to any member corporation organized under this Act."

It is true that, if the entire benefit of the sole enterprise upon which the corporation is empowered by its charter to enter inures to the general public and no profit or improvement of the economic condition or desires of its stockholders or members is contemplated, the corporation could not be said to be in business within the contemplation of Code § 94-1101. *Snow v. Johnston*, 197 *Ga.* 146, 156 (5) (28 S. E. 2d 270). But a corporation whose stockholders, by whatever name they may be designated, derive from the transaction of the business a profit in money or improvement in their economic conditions and desires, is engaged in business within the contemplation of the above-mentioned section, and is subject to the jurisdiction of the courts, under the same rules of practice that other electric corporations are.

The defendant in its brief quotes from well-chosen texts of legal encyclopedias, and cites decisions of various jurisdictions giving definitions and interpretations of the word "business." Adding to those furnished by the plaintiff in error, counsel for Georgia Electric Membership Corporation in the role of amicus curiae, gave to the court the benefit of a most informative and helpful compilation of decisions on the same subject. The plaintiff (now defendant in error), was also industrious in this behalf. This court is appreciative of the splendid work of counsel for both parties and the amicus curiae. The information furnished the court in the splendid briefs in this case is most interesting and enlightening.

The definitions of the word "business" are legion, multiplied throughout English and American jurisprudence to such an extent that definitions of the word favorable to any view of any controversy may be found. It is not necessary for any pursuit or endeavor to be characterized as "business" for its main object to be the earning of money for the corporation or its stockholders. It is enough if there is a monetary return contemplated for the shareholders of such corporation, and it does not seem to be necessary that the corporation be engaged in a business that actually earns or endeavors to earn money, if there is an improvement in the economic conditions or desires of the shareholders.

We are aware of the constitutional provision contained in article VII, section I, par. IV (Code, Ann., § 2-5404), which, so far as is material to the question before us, reads as follows: "The

General Asssembly may, by law exempt from taxation . . . All cooperative, non-profit, membership corporations organized under the laws of this State for the purpose of engaging in rural electrification, as defined in subsection I of Section 3 of the Act approved March 30, 1937, providing for their incorporation, and all of the real and personal property owned or held by such corporations for such purposes, are hereby exempted from all taxation, State, county, municipal, school district and political or territorial subdivisions of the State having the authority to levy taxes. The exemption herein provided for shall expire December 31, 1961."

The word "profit" as employed both in the Constitution and the act to which the above-quoted section refers does not, when construed in pari materia with § 94-1101 and the Electric Membership Corporation Act itself, exclude the electric corporations created under that act for the class of electric companies engaged in the business of generating and transmitting electricity. The Electric Membership Corporation Act uses certain descriptive words different from those employed in the corporation acts of this State, appearing in Title 22 of the Code, to define exactly the same things as are referred to in the general corporation law. One word contained in the Electric Membership Corporation Act designates both the shareholder and the customer; that word is "member." By whatever word the customer may be designated, he is still a customer, and by whatever name a shareholder may be referred to he is still a shareholder. This is well expressed in the case of Bookhart v. Central Electric Power Coop. Inc., 219 S. C. 414, 423 (65 S. E. 2d 781), in the following language: "By a simpler concept which seems sound and applicable the same result is reached with respect to the curious wording of the provision of the law which relates to 'membership.' It is that the customers, which are called 'members,' of the cooperatives are in the territories of their operation the 'public' which must be reasonably served, and to whom the service must be available on equal terms, in order to satisfy the undoubted rule that the power to condemn can only be delegated for, at least principally, a public use. There is no 'public' which is separable from the members in the rural areas where the cooperatives do business; and they at once take the place of the stockholders *and* customers of privately owned utilities; they are both owners and

customers, and that makes difficult at first the relation to this new situation of decisions affecting privately owned utilities. It is an example of the application of time-tested legal principles to a new factual situation."

There are several references in the Electric Membership Corporation Act to the business of such corporation which are indicative that it is engaged in business. These references are found in Code (Ann. Supp.) §§ 34A-107, 34A-108, 34A-114, 34A-115, 34A-117, and 34A-121. But the real answer to the question as to whether corporations chartered under that act are engaged in business within the meaning of Code § 94-1101 is clearly and affirmatively answered in the voice of § 14 (b) and (c) of that act (Ga. L. 1937, p. 653), reading as follows: "The revenues of the corporation shall be devoted first to the payment of operating and maintenance expenses, and the principal and interest on outstanding obligations, and thereafter to such reserves for improvement, new construction, depreciation and contingencies as the board may from time to time prescribe. . . Revenues not required for the purposes set forth in Subsection (b) of this section shall be returned from time to time to the members on a pro rata basis according to the amount of business done with each during the period, either in cash, in abatement of current charges for electric energy, or otherwise as the board determines; but such return may be made by way of general rate reduction to members, if the board so elects." Since the act itself plainly states that Electric Membership Corporations are engaged in business, that conclusion is inescapable, so we conclude that the petition sufficiently showed the trial court's jurisdiction.

2. The defendant's position that the petition disclosed that the plaintiff was not in the exercise of ordinary care, for the reason that he did not exercise the circumspection which an ordinarily prudent person would have employed in ascertaining that the defendant's wires were strung above the wellhouse in which he was engaged in removing the cylinder from the well, is not well taken. The petition alleges in paragraph 8 that the wires were concealed for some distance by foliage of trees, so that it is fairly inferable from the facts alleged that a man of ordinary prudence would not have ascertained their presence at the place where they were located.

In addition to this, there is nothing in the petition to indicate

that the plaintiff was aware that the wires were not insulated, or that they were of high voltage, or could apprehend for any other reason, that, if one of the pipes which he employed in his work should come in contact with them, he would be injured. It is a matter of common knowledge that a great many wires used, for instance, in telephonic communication are not charged with electric current of such voltage as would inflict injury upon a person in like circumstance. Merely seeing the wires strung over the property would not put the plaintiff on notice of a dangerous condition.

The defendant suggests, however, that the plaintiff should be charged with the negligence of the people who, standing on top of the wellhouse, and assisting him in removing the cylinder from the well, allowed the pipe to come in contact with the wires. The theory upon which this suggestion is made is that these people who were helping the plaintiff were his employees; but there is no suggestion in the petition that they were in fact the plaintiff's employees, or that any other relation existed between him and them of such a nature as to render him responsible for their actions.

But without any allegations to indicate that he knew that the wires were high-voltage wires, even if he himself had been handling the pipes at the time that they came in contact with the defendant's wires, this would not have constituted such a lack of ordinary care on his part as would render the petition subject to general demurrer. The case of *Welch v. City of Camilla*, 86 *Ga. App.* 609 (72 S. E. 2d 83), is a case of similar factual pattern as the instant case. There, as in this case, the electric company constructed its high-powered wires so close over a place where the plaintiff worked that a metal rod used in his work struck the wires, resulting in injury to the plaintiff. This court, speaking through Judge Carlisle, said: "The wire was 30.8 feet above the surface of the ground. While the height of the wires from the ground might be said to make them safe as to persons working on the ground, because it was not reasonably foreseeable that the work of such persons on the ground would ordinarily bring them within the dangerous ambit of the wires, we can not say as a matter of law, under the circumstances alleged here, that the defendant could not reasonably have foreseen that one of the employees of the Camilla Cotton Oil Company, to which class

Mr. Welch belonged, might touch the high-tension transmission wire with the 25-foot measuring pipe when that wire was located as close as 10 feet from employees performing such operation. Nor can we say that the plaintiff's husband under the circumstances alleged, was so contributorily negligent in allowing the metal measuring pipe to touch the high-tension transmission wire which he did not know was uninsulated and of high voltage. As was said in Graham v. Sandhill Power Co., 189 N. C. 381 (127 S. E. 429), and cited with approval in *Clinton* v. *Gunn-Willis Lumber Co.*, 77 *Ga. App.* 643, 648 (49 S. E. 2d 147): 'A company maintaining an electric line, over which a current of high and dangerous voltage passes, in a place to which it knows or should anticipate others lawfully may resort for any reason, such as business, pleasure or curiosity, and in such manner as exposes them to danger of contact with it by accident or inadvertence, is bound to take precaution for their safety by insulation of the wire or other adequate means.'"

The petition in this case shows that the plaintiff was at work in a certain wellhouse on the property of one Bryant in Bibb County. The work that he was engaged in was removing a cylinder from a well, which work required the use of long metal pipes. The pipes extended above the wellhouse in which the plaintiff was at work. These pipes were handled at that point by two of the plaintiff's helpers. The defendant had constructed certain high-tension uninsulated transmission wires so low above the wellhouse that the steel pipes, being negligently handled by the plaintiff's helpers, came in contact with the wires. The current went down the pipes and caused injury to the plaintiff. It was further set forth that the well in which the plaintiff was working when injured existed before the defendant constructed its transmission wires above it, and that the defendant therefore knew of the relative position of the wellhouse and its transmission lines. It was alleged that the defendant had knowledge of the common use of cylinder wells in the community where the plaintiff's injury occurred; that it was necessary to remove cylinders from the wells from time to time; and that long metal pipes of just the kind the plaintiff was using for the purpose when injured were generally employed in removing the cylinders. The lengths of the pipes and the manner in which they were joined together were set forth. So, all of the physical facts show-

ing that the metal pipes might reach the defendant's transmission lines, become charged with electricity, and result in the plaintiff's injuries, were set forth. The petition further showed that, in addition to the physical facts which rendered such an accident probable, the defendant knew from its experience that those helping the plaintiff in removing the cylinder from the well would probably allow the pipes to come in contact with the high-tension wires with resulting injuries to the plaintiff.

The defendant was charged with knowledge that such negligence might attend the removal of the cylinder from the well, because only a quarter of a mile distant, several months before, on the defendant's same transmission lines, where a cylinder was being removed from a well in the same manner and with the same kind of equipment as that employed by the plaintiff and his helpers, under circumstances in every material respect corresponding with those in which the plaintiff was injured, another such accident occurred, of which the defendant had knowledge. The details of the former event were set out fully.

In *McCullough* v. *Georgia Power Co.*, 81 *Ga. App.* 293 (58 S. E. 2d 505), the petition set forth facts similar to those alleged in the instant case, with the notable exception that in the *McCullough* case facts were not set forth showing that the power company was put on notice that those handling the pipes might be so negligent as to allow the pipes to come in contact with its wires. In the present case that deficiency is effectively supplied by allegations that the defendant knew that those handling the pipes might be negligent and by fully setting forth sufficient facts to support that allegation.

The petition in the *McCullough* case was held insufficient to charge the defendant with negligence, but it is good authority for holding that the petition in the instant case is sufficient to charge the defendant with such negligence as would render it liable for the plaintiff's injuries. In that decision it was said: "This is an unusual case in that instead of alleging facts showing probable general negligence of the defendant by reason of such facts, on the theory that if the defendant was negligent it would be immaterial how the injuries occurred or that they occurred in a way which might not have been actually anticipated, the plaintiff seeks to allege a case by showing facts which ordinarily would not constitute negligence, but which are deemed to be

sufficient to carry the case to the jury on the theory that the particular kind of injury here involved should have been anticipated, including the contributory negligence of the person injured or those working with him. Unless the petition alleges facts which charge the defendant with the duty of anticipating that an attempt would be made to extract the pipe without disconnecting it and that those working with the pipe would be negligent in handling it, it would not set forth a cause of action because it would show no reason why the defendant owed anyone a duty to insulate the wires or put them higher from the ground under the facts alleged. The allegations on this question do not specifically contain the statement that the defendant knew that the pipe might be taken from the ground without being disconnected, but if they did, it is not alleged that the defendant should have known that the men working with the pipe would negligently permit it to get out of control and come in contact with the electric wires."

In its demurrer the defendant made certain calculations and from those calculations concluded that it was impossible for the plaintiff to have been injured in the manner alleged in his petition. From the calculations it was its deduction that the wires passed 25 feet and 8 inches from the place where the pipe extended through the hole made for it in the roof of the wellhouse.

From the allegations of the petition no basis is furnished for a calculation showing that the distance from the place where the pipes emerged from the wellhouse to the defendant's wires was so great that it was impossible for the pipes to have come in contact with the wires. The petition alleges that only a few inches of the 15-foot pipe were still in the ground, and that the union of the 15-foot pipe and the 21-foot pipe was above the wellhouse, when the men on top of the wellhouse allowed the pipes to slip from their grip and strike the defendant's high-tension wires. It is not shown just how much above the top of the wellhouse the union between the two pipes was at the time, so no conclusion can be arrived at that discloses that the pipes did not extend far enough to come in contact with the defendant's wire 25 feet 8 inches from the point where the pipes extended through the roof of the wellhouse.

It does appear from the petition that the pipe was being withdrawn from the well by the plaintiff and the men who were as-

458

sisting him. He was on the inside of the wellhouse, according to the petition, and it does not appear that he knew of the decision of the men on top of the wellhouse to disengage the 15-foot pipe from the 21-foot pipe, or that he was not still pulling the pipe upward from the well so that it would extend further from the wellhouse at the very moment it began to fall toward the defendant's wires.

This court is aware of the rule of logic and law that the courts, in determining any matter, must recognize the physical laws, the laws of immutable nature, and must also take into consideration the various conclusions which scientific investigation has established, including the science of mathematics. This moves on the very sound doctrine that the allegation of a fact which is physically impossible is equivalent to no allegation at all.

This is not to be understood as holding that, where there is a positive allegation that certain physical objects came in contact with each other, mere small discrepancies in distances or slight variations in the lengths of objects will subject the petition to a general demurrer, though it indubitably might subject it to a special demurrer.

The trial court did not err in overruling the general demurrer.

*Judgment affirmed. Sutton, C. J., concurs in the judgment. Felton, J., concurs.*