Harry G. KINEALY and Lucile A. Kinealy, Appellants,

v.

SOUTHWESTERN BELL TELEPHONE COMPANY, a Corporation, Respondent.

No. 49656.

Supreme Court of Missouri.

Division No. 1.

June 4, 1963.

Marvin Klamen, Clayton, for plaintiffs-appellants, Klamen & Grand, Clayton, of counsel.

John Mohler, Donald K. King, Philip L. Wettengel, St. Louis, for respondent, Southwestern Bell Telephone Co.

HOUSER, Commissioner.

Plaintiffs Harry and Lucile Kinealy, husband and wife, sued Southwestern Bell Telephone Company for loss of and damages to their land, claimed to have been caused by the cutting of ditches for underground telephone cables. Plaintiffs asserted ownership of two parcels of contiguous lands, Lots A and B, located on the south side of State Highway 21, where the highway crosses the Meramec River in St. Louis County. Lot A, the western boundary of which is the river and the northern boundary of which is the bridge right of way, is a pie-shaped wedge 1200 feet long and approximately 60 feet wide at the north end and 30 feet wide at the south end. Adjoining Lot A on the east is Lot B, a 14-acre tract. Butler Hill Road runs perpendicular to the highway (roughly parallel with the river) as an easement along the common boundaries of Lots A and B. This road, an asphalt pavement 22 feet wide, was built on a 40-foot right of way.

The first four counts of the petition charged that in February, 1956 the company cut a ditch and laid a cable on the west or river side of the road, allegedly on plaintiffs' Lot A, as a result of which a portion of Lot A slipped, slid, fell into and was washed away by the river. These counts were based upon loss of lateral support, nuisance, trespass and negligence. Plaintiffs prayed for $25,000 damages in Counts I and II; $75,000 actual and $200,000 punitive damages in Count III, and $25,000 actual and $250,000 punitive damages in Count IV.

Counts V, VI, VII and VIII, based upon loss of lateral support, nuisance, trespass and negligence, respectively, related to the action of the company in July, 1957 when it cut a second ditch and laid a cable on the east side of the road, allegedly on plaintiff's Lot B, as a result of which a portion of

.Lot B was alleged to have slipped, etc. into and was washed away by the river. Plaintiffs prayed for $20,000 damages in Counts V and VI; $60,000 actual and $100,000 punitive damages in Count VII, and $20,000 actual and $100,000 punitive damages in Count VIII.

Counts IX and X related to the erection of a telephone pole on plaintiffs' land. In Count IX plaintiffs prayed for $10,000 actual damages, and in Count X the prayer was for $30,000 actual and $45,000 punitive damages.

The total amount prayed for in all counts was $1,005,000. Counts I to VIII, inclusive, terminated in a directed verdict for defendant. Plaintiffs voluntarily dismissed Count IX. The case went to the jury on Count X. A verdict for plaintiffs for $1 was returned, and judgment was rendered accordingly. Plaintiffs appealed from the orders of the circuit court overruling plaintiffs' motions to set aside the judgment and for a new trial. Appellants' intent being manifest, we treat this as an appeal from the judgment sustaining defendant's motion to direct a verdict on Counts I through VIII, and from the judgment on Count X. In the oral argument plaintiffs' counsel conceded that the issues of lateral support, nuisance and negligence have been abandoned. This leaves for review the question of the propriety of the action of the court in directing a verdict for the company on the issue of trespass; a question of the admission of evidence; the propriety of an instruction, and the failure to grant a new trial on the issue of damages only on Count X, for inadequacy of the verdict.

The first question on the issue of trespass is that of causation. Did plaintiffs make a submissible cause on the question whether the ditching operations of the company constituted the proximate cause of the land slides? The question of proximate cause is usually one for the jury, and may be shown by circumstantial evidence. Curtis v. Fruin-Colnon Contracting Co., 363 Mo. 676, 253 S.W.2d 158, 161. Was there sufficient circumstantial evidence to submit this case to the jury, considering the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to plaintiff?

Lot A was "made land." It had been built up or filled in with brick prior to 1951. A record high water level was recorded in 1950 in the areas of Lots A and B. As the water receded on that occasion there was no discernible or extensive damage to Lot A. After plaintiffs assumed control of Lots A and B in 1955 they improved Lot A by filling in with more brick, rock and dirt, to build up the river bank and level the lot for use as a private park. For public use of Lot A they charged admissions. In February, 1956 the company, using a crawler-type trencher, trucks and equipment, ditched along the river side of Butler Hill Road and buried a telephone cable. The ditch, 18 inches wide and approximately 3 feet deep, was cut between 2 and 3 feet west of west edge of the asphalt pavement of Butler Hill Road. When the company employees left the job they left a mound of loose, untamped dirt 6 or 8 inches high on top of the ditch. No testimony was introduced on the question whether the company packed or tamped the dirt as they replaced it in the ditch, under the loose and untamped mound left on top. There was no high water until thirteen months later, in March, 1957, when a flood occurred on the Meramec River, inundating this ditch. A couple of days later, when the water was receding, portions of Lot A fell, slid into and were washed away by the river. The loss of the land occurred within one hour's time. A crack 2 or 3 inches wide appeared at the side of Butler Hill Road, running a distance alongside the road, on the river side, parallel to and immediately adjacent to the road and the telephone cable. It looked like the earth had opened up. Perpendicular cracks then began to appear at the north end of Lot A, commencing at the water's edge and ending at the crack alongside the road. Then these perpendicular cracks began to appear, one by one, going toward the

south end of Lot A. A piece of land, from water's edge to the crack near the road, would drop or settle a foot or so, remain there for an instant, then break off in irregular pieces, slide, and wash away into the river, carrying with it trees, earth and fill. A sheer bank 15 to 20 feet high from normal water level to the level of the road on Lots A and B was left exposed. When the land washed away the telephone cable was exposed at places along the line where the crack first appeared near the road, leaving the cable in mid-air a foot from the bank. The 1957 washout did not extend to the road. On July 2, 1957 a record high flood occurred, but there was no observable damage in the nature of a fallout or washout in this immediate area as a result of this flood. Shortly after July, 1957, the company cut another ditch and installed another cable, this time on the east side of the road, again leaving a six-inch mound of earth, apparently untamped, on top of the ditch. Eight months later, in March, 1958, another flood occurred, and as the water receded more land washed away, breaking into and washing away parts of the Butler Hill Road, again exposing the telephone cable about 4 feet below the road level.

Plaintiffs' expert geologist defined land slides; discussed the tendency of a mass of soil to move in a lateral direction away from the slope; sheer strength; the effect of weather conditions on sheer strength; the "resisting moment"; the "plane of failure"; the effect on sliding of shortening the plane of failure; the factor of safety in balance; the effect of removal of material on failure; the tendency of impervious soil to concentrate itself approximately one foot below the surface along a river bank. He testified that a ditch 2 or more feet deep would breach this impervious layer and allow water to enter the plane of failure; that if the layer were impervious water would be prevented from seeping down and along a plane of failure; that fill in the form of brick tends to stabilize the slope and resist the tendency to slide; that

tree roots also would tend to deter failure, and that a mechanical ditcher would sever the roots, thus encouraging motion along a plane of failure. He knew nothing, however, about the trees or roots present in this case. He testified that a ditch 2 or 3 feet deep in a depth of 17 to 20 feet would be a relatively large percentage of the plane of failure; that if the ditch were not tamped, water would be introduced into the plane of failure; that this water would lubricate the mass, reduce sheer strength, and increase the tendency of a bank to slide; but that if the ditch were properly tamped it would tend to shed water. The expert said it was necessary to consider the strength or nature of the soil and the stresses involved in determining the cause of land slides. This is done by actual inspection and taking of samples. Without a test of this soil it cannot be said how much resistance was present prior to the slide. A test of the material in the adjoining area which did not slide will not suffice, since soil along a river bank is highly variable. In this case, not having been able to take soil samples of the earth because it was washed away, the expert was unable to scientifically reconstruct the ground as it was before the landfall. When a hypothetical question was asked he could not, with reasonable professional certainty, state that the ditching had any effect whatsoever in causing the landfall, but stated that it was possible; that there was a strong possibility that the ditching was a contributing factor; but that he could not say definitely that it was a contributing cause. Asked whether it was a mere possibility or a probability that the ditching contributed to the failure he stated "it's extremely likely this may have had an effect which would cause failure." Contrarily he testified that cases are extremely rare in which such a small ditch would be a contributing factor in a slide or landfall. He stated there are several causes for landslides: laterally moving ground water flowing to the river through the bank; excessive fill on top of a bank; hydraulically placed fill; and an undercutting of the toe

of the slope of a bank. He stated further that the removal of soil at the toe of a bank creates a greater possibility of bank failure than the removal of the same amount of soil ditched from the top of a bank.

■■ The burden was on plaintiffs to prove by substantial evidence that the ditchings caused or contributed to cause the landfalls. Plaintiffs failed to do so. The jurors, laymen inexperienced in technical matters of this kind, were not given sufficient facts or circumstantial evidence to support an inference, without the assistance of expert opinion, that the cutting of the ditchings caused, probably caused or contributed to cause the landfalls. See Evans v. Massman Const. Co., 343 Mo. 632, 122 S.W.2d 924 [16, 17]. Plaintiffs' expert geologist testified in generalities as to the scientific factors which enter into a situation such as this, but recognizing the insufficiency of the data at hand he refused to give a professional opinion that the ditchings caused, or probably caused, the landfalls. Accordingly, the jury could not have brought in a verdict for plaintiff without engaging in guesswork. There was no evidence as to the nature, strength and character of the soil which gave way; no proof that the ditching operations actually severed tree roots which were contributing to the stability of the mass of ground, nor any substantial evidence that there were trees growing alongside the road adjacent to the ditch; no showing that the ditches cut an impervious layer of subsoil, or whether the company tamped and packed the dirt as it was replaced in the ditch after laying the cable, thus tending to shed water, or whether the dirt was thrown back into the ditch loosely without tamping, which would permit water to enter the plane of failure and lubricate the mass; or whether water in fact entered through the ditch and under the mass which slid into the river. The expert could not and would not venture an opinion with professional certainty that the ditching had any effect whatsoever in causing the landslides. Looking only at his tes-

timony in the light most favorable to plaintiffs and ignoring for the moment the inconsistency in his statements, the best that can be said is that the expert testified that while it was possible or likely that the ditching was a factor contributing to the landfalls, he could not say definitely. There was no reasonable certainty in his mind. An assurance that the ditchings possibly were a factor is not of itself sufficient to make a submissible case. Kimmie v. Terminal R. R. Ass'n of St. Louis, 334 Mo. 596, 66 S.W.2d 561, 565. The expert's one statement that it was "extremely likely" that the ditchings may have had a causal effect on the failure, taken by itself, brings his testimony to the borderline of probability, but we construe his testimony, considered as a whole, as an opinion that the ditchings constituted nothing more than a possible cause —an assurance that such a result was scientifically possible, if certain assumptions existed as facts. The mere scientific possibility, unsupported by proof of existing facts, was not substantial evidence that the slides resulted from the ditching. See 32 C.J.S. Evidence § 569, p. 400.

■ Other possible causes for the landslides for which the company would not be liable, several of which appeared to have been as likely as the one assigned, were not excluded as causative factors. Where the evidence does not exclude all other causes and where no laymen could know or have any reasonable basis for an inference as to cause, opinions of experts that a certain occurrence or condition might or could produce a certain result is no more than an assurance that such a result is scientifically possible, and does not alone constitute substantial evidence that such occurrence or condition did cause it. Hunt v. Armour & Co., 345 Mo. 677, 136 S.W.2d 312, 316, and cases cited. That the circumstantial evidence is consistent with the theory that the cutting of the ditches caused the landfalls is not sufficient. The circumstances in evidence must prove this as a *reasonable probability*, and the jury may not be permitted to reach this conclusion by "theorizing upon

assumed factual premises outside of and beyond the scope of the evidence." Brawley v. Esterly, Mo.Sup., 267 S.W.2d 655, 659, cited with approval in Lindsay v. Wille, Mo.Sup., 348 S.W.2d 1, 4, 5 [5]. In order to make a submissible case the expert would have to "go further and testify at least that, taking into consideration all the attending data, it is his professional opinion that the result in question most probably came from the cause assigned." Freedom Oil Works v. Beaver County, 298 Pa. 174, 148 A. 67, 69, 68 A.L.R. 600.

The instant case differs from cases cited by plaintiffs, in each of which there was ample evidence from which the jury could infer that the defendant's acts caused the damage. In Curtis v. Fruin-Colnon Contracting Co., supra, defendant dug a 4-foot ditch on plaintiff's land 2 feet from plaintiff's building at one point and 7 feet at another. The ditch had no outlet. It was left open to catch rain all summer. The soil was sandy and porous. Considerable rain collected in the ditch and seeped from the ditch into the ground. Following heavy rains there was a loud popping and cracking. The foundation adjacent to the ditch cracked and the water from the ditch drained into the basement. The side of the building adjacent to the ditch then settled. No water entered the basements of two other buildings with the same back yard but farther away from the ditch. After the ditch was filled no water ever got into the basement of the damaged building. In Knoche v. Pratt, 194 Mo.App. 300, 187 S.W. 578, defendant excavated an 11-foot ditch on the lot line between his lot and plaintiff's, 4 feet from the west wall of plaintiff's building, and several feet below the level of the footings of plaintiff's building. Defendant then went on plaintiff's land and excavated another 2 feet, in order to be able to cement the outside of the foundation wall he proposed to build. This removed 2 of the 4 feet of earth between plaintiff's foundation and the property line, as a result of which the rest of the dirt caved away from plaintiff's foundation and the west wall of her building fell.

Looking at the evidence in the case here for review in the light most favorable to plaintiffs, it was not sufficiently substantial and certain to justify the submission of the case to the jury. A finding that the ditching caused the losses could not have been made without surmise, speculation and conjecture. There was no error in directing a verdict for the company as to Counts I through VIII, on the basis of failure to prove causation.

■ Appellants claim, however, that at least they were entitled to go to the jury on Count III, the trespass count, for "the mere technical trespass" by reason of the "ditching, destroying of the tree roots, killing the grass, erecting the 'cable' signs, by dumping the dirt and mounding it," etc. The difficulty with this contention is that plaintiff did not prove, but merely assumes, that these events took place upon plaintiffs' private property. The proof is that these ditching operations occurred 2 feet or so from a 22-foot blacktop on a 40-foot right of way. The answers to the interrogatories do not admit that a technical trespass was committed, deny entry upon plaintiffs' property and state that the entry was upon the public right of way between the traveled portion of the highway and the right of way line, except for the surveying and engineering work done in August, 1955 in preparation of an engineering working plan (for which plaintiff made no complaint in the petition) and the trespass involved in placing one pole one foot over on plaintiff's land (the subject of Count X).

■ Appellants strenuously urge error in directing a verdict upon Counts I through VIII "inasmuch as the evidence conclusively showed defendant to have entered upon plaintiffs' land without right or authority." This is based upon the alleged failure of the company to obtain the assent of the county court to the use of the right of way of the road in which to lay the cables, under §

229.100, and a special use permit from the county highway engineer and surveyor, under § 229.300, and the company's alleged failure to comply with § 392.080, V.A.M.S.

We consider it immaterial to the outcome of this lawsuit whether the company performed these ditching operations with or without the necessary permission and assent of the authorities. It makes no difference whether the company was an unlicensed trespasser or acted in full compliance with all regulatory laws, for the reason that plaintiffs failed to establish by substantial evidence that the company's actions caused the losses and damages sustained by plaintiffs. The company's liability does not depend upon whether it was licensed or unlicensed. It has no liability in either event, in view of plaintiffs' failure to prove the necessary element of causation. Certainly there is no causal relation between the lack of a permit and the landfalls. If the company had obtained a permit and all necessary authorizations from the authorities, it would not thereby have prevented the landfalls. Southwestern Bell Tel. Co. v. Rawlings Mfg. Co., Mo.App., 359 S.W.2d 393, 399 [5].

If appellants are taking the position that the company's application for a permit to cut these ditches would have been refused, or that the county highway engineer would have required the company to string its cable on poles, appellants still failed to make a case for the jury, because there was no evidence to support a reasonable conclusion that such an application would have been denied or so limited, or that the landfalls would not have occurred if the ditches had not been cut.

These rulings make it unnecessary to consider the error claimed to have been committed in admitting evidence tending to show that plaintiffs did not have title to Lot A.

Plaintiffs contend that Instruction No. 6 improperly states the requirements for the allowance of punitive damages. Plaintiffs cannot complain of the giving of Instruction No. 6 because it is an exact converse of plaintiffs' Instruction No. 5. Tinsley v. Massman Const. Co., Mo.Sup., 270 S.W.2d 835, 841 [8]; Hollister v. A. S. Aloe Co., 348 Mo. 1055, 156 S.W.2d 606, 609 [10]; Evans v. Atchison, T. & S. F. R. Co., 345 Mo. 147, 131 S.W.2d 604.

Finally, plaintiffs urge that the verdict for $1 is grossly and shockingly inadequate, "in view of all the facts and circumstances," citing Brown v. Moore, Mo. Sup., 248 S.W.2d 553, a suit for personal injuries and damage to an automobile. Plaintiff Harry Kinealy testified that the location where the pole was placed was worth $5 a month in rental value, but admitted that he had not called the telephone company to complain about the location of the pole. His testimony that the pole was 10 feet over on his property was contradicted by engineering testimony that it was only one foot over the line. Evidently the jury considered that Kinealy was impeached; that the slight encroachment in that location constituted nothing more than a technical trespass; that punishment was not called for, and that $1 was adequate damages. Under all the evidence we are not convinced otherwise.

The judgment is affirmed.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.