Linden HILLS and Patricia Hills, Plaintiffs-Respondents,

v.

OZARK BORDER ELECTRIC COOPERATIVE, Defendant-Appellant.

No. 14059.

Missouri Court of Appeals, Southern District, Division Three.

March 31, 1986.

Motion for Rehearing or Transfer Denied April 16, 1986.

Application to Transfer Denied June 17, 1986.

Norman L. Chadwick, Poplar Bluff for defendant-appellant.

Daniel T. Moore, Poplar Bluff, for plaintiffs-respondents.

## PER CURIAM.

Plaintiffs, Linden Hills and Patricia Hills, contend that a fire at their body shop was caused by defendant furnishing electricity to the shop in a dangerously defective condition in that it fluctuated to high levels of excessive voltage. It is alleged that the condition resulted from the breaking of a line, to which a ground wire had been improperly connected, near defendant's transformer which served plaintiffs' property. Following a jury verdict and judgment in plaintiffs' favor, defendant appeals.

Plaintiffs' claim was submitted to a jury on an instruction which followed MAI 25.04 (1981), "Verdict Directing—Strict Liability—Product Defect." The instruction is set forth below.[1]

Defendant's discursively penned and somewhat overlapping points relied on essentially argue that the theory of strict liability in tort for the sale of a defective and unreasonably dangerous product does not apply to the furnishing of electricity, but even if it does extend "to for-profit utility companies it would not be applicable to a non-profit rural electric cooperative." It is also urged that the trial court erred in overruling defendant's motion for a directed verdict in that "[n]o evidence whatever was adduced that plaintiff[s] sustained damages as a direct result of a defect in any product."

In *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362, 364 (Mo.1969), Missouri adopted "the rule of strict liability in tort stated in 2 Restatement, Law of Torts, Second, § 402A" (1965). That rule says that a seller of "any product" is subject to liability, under certain conditions, to a user or consumer if the product was sold "in a defective condition unreasonably dangerous to the user or consumer or to his property." Whether strict liability as described in § 402A can be applied to damage caused by the furnishing of electricity has not been decided in Missouri.[2] Intriguing and important as this question is, however, we conclude that it is unnecessary to reach that issue in resolving the present appeal. Instead, our attention need only be directed to the principles that there must be substantial evidence to support each element of a party's cause of action, no fact essential to submissibility can be inferred unless there is a substantial evidentiary basis for it, and a necessary element cannot be based upon speculation, conjecture or guesswork. *Tri-Continental Leasing Co. v. Neidhardt*, 540 S.W.2d 210, 211 (Mo.App.1976).

Proof that a plaintiff's damages were caused by a defect in the product is an essential element of a plaintiff's case under a product liability theory. *Duke v. Gulf & Western Manufacturing Co.*, 660 S.W.2d

---

1. "Your verdict must be for plaintiffs if you believe:
   First, defendant sold electricity in the course of defendant's business, and
   Second, the electricity was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and
   Third, the electricity was used in a manner reasonably anticipated, and
   Fourth, plaintiffs were damaged as a direct result of such defective condition as existed when the electricity was sold."

2. Missouri courts have held that electric companies are not insurers of safety in generating and transmitting electricity, but become liable under general principles of negligence. *See, e.g., Hamilton v. Laclede Electric Cooperative*, 294 S.W.2d 11, 15 (Mo.1956); *Calderone v. St. Joseph Light*

*& Power Co.*, 557 S.W.2d 658, 667 (Mo.App. 1977). These cases did not focus on the sale of electricity as a consumer product. Where such is the focus, courts in some jurisdictions have held the seller subject to strict liability in tort if the electricity has been put into the "stream of commerce" beyond the seller's distribution system. *Pierce v. Pacific Gas & Electric Co.*, 166 Cal.App.3d 68, 212 Cal.Rptr. 283 (1985); *Aversa v. Public Service Electric & Gas Co.*, 186 N.J.Super. 130, 451 A.2d 976 (1982); *Ransome v. Wisconsin Electric Power Co.*, 87 Wis.2d 605, 275 N.W.2d 641 (1979). This theory, of course, requires the finding of a "defect," such as the electricity entering the customer's electrical system in a dangerous and unanticipated condition. See *Pierce, supra*, 212 Cal.Rptr. at 287 n. 1; *Ransome, supra*, 275 N.W.2d at 648–49.

404, 409 (Mo.App.1983). Defendant, the appellant herein who suffered an adverse judgment below, has specifically raised the issue of submissibility as it relates to the element of causation, and we are not prevented from resolving this appeal on that critical issue alone. *Cf. Grippe v. Momtazee,* 696 S.W.2d 797 (Mo. banc 1985).

To determine if plaintiffs established a submissible question on the disputed factual issues, the evidence and reasonable inferences from that evidence are viewed in a light most favorable to plaintiffs. *Wilson v. Missouri-Kansas-Texas Railroad Co.,* 595 S.W.2d 41, 44 (Mo.App.1980). Following that rule, the facts set out below disregard defendant's evidence, except where it aids plaintiffs. *Gibson v. Newhouse,* 402 S.W.2d 324, 326 (Mo.1966).

Defendant sells electricity to plaintiffs for their house and body shop. The house is adjacent to the body shop. Defendant's "primary" lines, which include a "neutral" line, approach plaintiffs' premises and carry electricity at 7200 volts. These lines connect to a transformer owned by defendant on, or near, plaintiffs' property. The function of the transformer is to reduce the voltage to "120/220 volts." After passing through the transformer the electricity goes on separate "secondary" lines through meters into the house and body shop.

On the evening of the fire plaintiffs had been at Mr. Hills' mother's house. When they arrived back at the house and body shop at approximately 9:30 p.m., the body shop was on fire. Mrs. Hills attempted to call the fire department from a phone in their house but the phone did not work. Apparently, plaintiffs' neighbor called the fire department.

Between 10:00 and 10:30 p.m., employees of defendant arrived at plaintiffs' property to disconnect the electricity to the body shop. Plaintiff Patricia Hills testified that before defendant's employees arrived, she went back into the house and attempted to turn on the lights in the kitchen. The light bulbs "flashed" and burned out. She said this was the first time she had turned on the lights in the house because when she attempted to use the phone earlier she had not turned on the lights as their vehicle lights were shining into the house.

Defendant's employees disconnected the electricity to the body shop at the transformer. Just before they left, Mrs. Hills returned to the house and turned on the bedroom lights and the light bulbs there also "flashed" and burned out. She tried to stop defendant's employees but "they were already on the road." Defendant's employees were called back and arrived about 3:00 a.m. Plaintiff Linden Hills said when the employees of defendant returned the employees shined a light on the transformer pole and one said, "There's the problem. Neutral wire's down." The wire had broken a few feet from the pole. They then rehooked the neutral and ground wires.

Plaintiff Linden Hills, apparently using a photographic exhibit showing the transformer, part of the pole, and part of the primary neutral line, said that, when he looked up at the pole while standing with defendant's employees, the ground wires were "disconnected, too, because that's where they was connected on is where this come apart." How he contends they were connected cannot be told from his testimony. A hypothetical question later asked by plaintiffs' attorney of an expert witness indicates that Mr. Hills meant that a ground wire from the transformer was attached to the primary neutral line and when the neutral line broke the ground wire was disconnected. The particular hookup as remembered by Hills for purposes of the expert's testimony was described by that expert as not being an "acceptable practice."

According to plaintiff Linden Hills, an odor was discovered in the house the second time plaintiffs went in. What it smelled like was not stated, but he said it caused them to think the house was on fire. Later that night plaintiffs discovered that their furnace and appliances in the house would not work and they eventually had to be repaired. Why the furnace and appli-

ances did not work, what caused the failures, and what repairs were necessary is not in evidence beyond the abstract statement that a motor burnout "usually" indicates over-voltage.

Plaintiffs' expert testimony came from an electrical engineer. He said that if the ground wire of the transformer was connected as plaintiff Linden Hills told him it was, when the primary neutral line broke, the electricity "definitely could" have behaved abnormally. He then described "the occurrence that could have taken place," and offered an opinion that the line breaking "could have caused an over-voltage." An apparent part of plaintiffs' theory of what could have happened, as represented by the engineer's testimony, was that the over-voltage current was diverted to a ground connected to the electrical panel of the body shop and was actually conducted by conduit which was described as "part of the grounding system." It was then stated that the electrified conduit "could possibly become hot enough to start a fire." The expert also stated that "[h]igh over-voltages will cause light bulbs to instantly extinguish and blow." As to the light bulbs, a witness for defendant tended to agree. A detective with the Poplar Bluff Police Department's Arson Unit, who was "also a member of the State Fire Marshal's Office," testified for plaintiffs that the fire at the body shop was caused by electricity.

As plaintiffs state, citing *Williams v. Deere & Co.*, 598 S.W.2d 609 (Mo.App. 1980), strict liability in tort does not require impossible standards of proof. The proof must be realistically tailored to the circumstances and the existence of a defect may be inferred from circumstantial evidence with or without the aid of expert evidence. *Williams, supra,* 598 S.W.2d at 612. *Williams* states, "[c]ommon experience tells us that some accidents do not ordinarily occur in the absence of a defect and in those situations the inference that a product is defective is permissible."

However, "common experience" does not aid plaintiffs here. It tells us that electrical fires can occur in the absence of excessive voltage and it is of little aid in determining if excessive electrical voltage caused a fire. That an "electrical" fire occurred at plaintiffs' body shop does not establish that it was caused by defendant furnishing electricity in the defective condition claimed by plaintiffs. Other factors such as the electrical wiring in the body shop could have been instrumental in causing the fire. Plaintiffs made no attempt to present evidence that might have eliminated other conditions that could have caused the fire.

We also recognize the rule that "[a]bsolute certainty or positive proof of causation by an expert witness is not required in a products liability case." *Lifritz v. Sears, Roebuck & Co.*, 472 S.W.2d 28, 32 (Mo.App. 1971). However, expert evidence that damage "could" have been caused by certain things is not sufficient to establish causation by itself,[3] but can be considered together with other evidence to determine if the evidence is sufficient to make a submissible question for the trier of fact. *Ketcham v. Thomas*, 283 S.W.2d 642, 649 (Mo. 1955); *Baker v. Kansas City Terminal Ry. Co.*, 250 S.W.2d 999, 1007 (Mo.1952); *Bertram v. Wunning*, 385 S.W.2d 803, 807 (Mo.App.1965). Here, not only is the conclusion that excessive voltage "could" have caused the fire insufficient to prove that it did, but other evidence combined with the expert testimony is insufficient to make a submissible issue on causation.

Damage to the light bulbs indicates that within an hour after the fire was discovered, excessive voltage was transmitted into the house. If so, it would also have reached the body shop. Although a subsequent condition may help establish a preceding condition, see *Hoover's Dairy, Inc.*

---

**3.** For a discussion of the level of certainty necessary for an expert to make a submissible case on the matter of causation, see *Kinealy v. Southwestern Bell Telephone Co.*, 368 S.W.2d 400, 404–405 (Mo.1963) (speaks of need for an expert opinion that a result "most probably" came from a specified cause). See also *Lifritz v. Sears, Roebuck & Co.*, 472 S.W.2d 28, 32 (Mo. App.1971).

v. *Mid-America Dairymen, Inc.*, 700 S.W.2d 426, 434 (Mo. banc 1985), there is insufficient evidence here to indicate a preceding condition of excessive voltage which caused the fire.

Taking as true plaintiffs' assertions that excessive voltage entered the body shop when the ground wire on the transformer disconnected because of its improper attachment to the primary neutral line, sufficient evidence that this caused the fire is still lacking. There is no evidence establishing that the break in the neutral line occurred before the fire. The only evidence indicating that the break might have occurred before the fire started is that a fire occurred.

In sum, the evidence most favorable to the plaintiffs shows (1) that an electrical fire occurred which could have been caused by over-voltage current, (2) that within an hour after the fire was discovered there apparently was excessive voltage on plaintiffs' side of the transformer, and (3) that the excessive voltage could have been caused by a condition of the equipment first observed several hours later. Having a circumstance, which could have caused the fire, present well after the fire is discovered does not make it sufficiently probable that such condition did cause the fire. A fire, in some manner due to electricity, is simply not that unusual. The fact that circumstantial evidence is consistent with the theory of causation advanced by plaintiffs is not enough. *Kinealy v. Southwestern Bell Telephone Co.*, 368 S.W.2d 400, 404 (Mo.1963). Whether the claimed defect existed at the time the fire started, and, even if it did, whether this defect caused the particular fire, are matters left to speculation and conjecture by the favorable evidence.

The judgment is reversed.

PREWITT, C.J., and MAUS, J., concur in result and file concurring opinions.

PREWITT, Chief Judge, concurring.

The principal opinion does not decide if strict liability in tort applies to sellers of electricity placed into the "stream of commerce", but the opinion reviews causation as if strict liability does apply. Although cases, some cited in the principal opinion, talk about the degree of proof required in strict liability in tort, I doubt if the proof of causation required under that theory would be different from that required under any other theory of liability. However, because whether plaintiffs' theory of liability applies is the more significant question and could be dispositive, before reviewing causation I would determine if strict liability in tort could apply here.

Defendant contends that strict liability in tort does not apply to the furnishing of electricity, but "if the product liability theory was extended to for-profit utility companies in this situation, it would not be applicable to a non-profit rural electric cooperative."

In *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362, 364 (Mo.1969), Missouri adopted "the rule of strict liability in tort stated in 2 Restatement, Law of Torts, Second, § 402A" (1965). This section is set forth below.[1] As the principal opinion notes, whether strict liability as described in § 402A can be applied to damage caused by electricity has not been decided in Missouri.

Missouri cases have said that electric generating companies do not have "strict

---

**1.** *§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer*

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

  (a) the seller is engaged in the business of selling such a product, and

  (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

  (a) the seller has exercised all possible care in the preparation and sale of his product, and

  (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

liability" for injuries resulting from electricity, *Mrad v. Missouri Edison Co.,* 649 S.W.2d 936, 941 (Mo.App.1983), and that such companies are not insurers of the safety of persons, but that their liability is determined by principles of negligence. *Hamilton v. Laclede Electric Cooperative,* 294 S.W.2d 11, 15 (Mo.1956); *Calderone v. St. Joseph Light & Power Co.,* 557 S.W.2d 658, 667 (Mo.App.1977); *Donovan v. Union Electric Co.,* 454 S.W.2d 623, 626 (Mo.App.1970); *Foote v. Scott-New Madrid-Mississippi Electric Cooperative,* 359 S.W.2d 40, 43 (Mo.App.1962).

However, those decisions do not cover this situation. There the courts were not discussing products liability based on strict liability in tort. Rather, they were stating that the utilities were not strictly liable without fault for any injuries resulting from the transmission of electricity. None of the cases involved an attempt to proceed on a products liability theory, perhaps because they involved only the transmission, not the sale of electricity.

In response to a question, counsel for appellant stated in oral argument that he had not found a case holding that sellers of electricity cannot be subject to strict liability in tort if the electricity has been put into the stream of commerce.

All of the cases from other jurisdictions which are cited to us or we have found, hold that sellers of electricity are subject to strict liability in tort if the electricity has been put into the stream of commerce. See *Pierce v. Pacific Gas & Electric Co.,* 166 Cal.App.3d 68, 212 Cal.Rptr. 283 (1985); *Aversa v. Public Service Electric & Gas Co.,* 186 N.J.Super. 130, 451 A.2d 976 (1982); *Ransome v. Wisconsin Electric Power Co.,* 87 Wis.2d 605, 275 N.W.2d 641 (1979). See also *Petroski v. Northern Indiana Public Service Co.,* 171 Ind.App. 14, 354 N.E.2d 736, 747 (1976) ("Electricity is a product which can be sold within the meaning of § 402A"); *Buckeye Union Fire Insurance Co. v. Detroit Edison Co.,* 38 Mich.App. 325, 196 N.W.2d 316 (1972) (implied warranties apply in sale of electricity); Note, Torts of Electric Utilities: Can Strict Liability Be Plugged In?, 11 Loy.L.A. L.Rev. 775 (1978).

Distributing electricity is different from distributing most other commodities. Many overhead transmission lines are near public roads exposing the lines to damage by vehicles. Vandals and acts of nature can affect the lines. Some of the things that could affect electrical transmission may be impossible, as a practical matter, to prevent or guard against. Applying strict liability in tort to a seller of electricity seems harsher than to the seller of a product where the seller can more easily prevent alterations to its products before they are sold.

Nevertheless, the sale of electricity would appear to come within the strict liability in tort rule of the Restatement. Electricity can be sold, consumed, and stolen. When its voltage is far in excess of that contemplated it can be unreasonably dangerous for the anticipated use.[2] Spreading the risk of the loss in such a situation is more desirable than placing the burden on individual consumers.

I believe that this court should hold that strict liability in tort is a proper theory to assert damages against an electrical utility company if electricity leaves the company's system and enters its customer's electrical system in a dangerous and unanticipated condition. This theory would not be applicable to damage while electricity is being transmitted by a utility within its own system. See Annot., Applicability of Rule of Strict Liability to Injury from Electrical Current Escaping from Powerline, 82 A.L.R.3d 218, 223 (1978).

That defendant may be a nonprofit rural electric cooperative does not insulate it from liability on this theory. Such cooperatives are liable in tort. *Byrd v. Blue Ridge Rural Electrical Cooperative,* 215 F.2d 542, 547 (4th Cir.1954); cert. denied. 348

---

**2.** The claimed defect of excessive voltage here is neither a design defect or a manufacturing defect in their usual sense. See Fischer, Products Liability—The Meaning of Defect, 39 Mo.L.Rev. 339, 340 (1974).

U.S. 915, 75 S.Ct. 295, 99 L.Ed. 717 (1955). See also *Lamar Electric Membership Corp. v. Carroll,* 89 Ga.App. 440, 79 S.E.2d 832 (1953); *Erwin v. Guadalupe Valley Electric Co-op.,* 505 S.W.2d 353 (Tex.Civ. App.1974).

Defendant relies upon *Katz v. Slade,* 460 S.W.2d 608 (Mo.1970), to support the position stated in its brief that "[i]n Missouri the application of the rule of strict liability in tort is limited to mass producers and distributors of the products of industry engaging in profit-making businesses organized for economic gain." *Katz* held that strict liability in tort could not be used against a city for leasing defective golf carts. The court's holding is summarized by its statement that "[u]nder the circumstances of this case we adhere to the previous holdings restricting the application of the rule of strict liability in tort to mass producers and distributors of the products of industry." 460 S.W.2d at 613. Here, defendant is a distributor of electricity, a product of industry. As such, defendant is not aided by *Katz.*

Believing that strict liability in tort can apply to defendant's sale of electricity, I would review and find, as did the principal opinion, that there was insufficient evidence that the defect claimed caused the fire.

MAUS, Judge, concurring.

I concur in the result. However, I do not believe the liability of the defendant should be analyzed in terms of "strict liability." I am of the opinion the sale of electricity upon passing through a distribution system such as that in question is not the sale of a "product" within the meaning of 2 Restatement, Law of Torts, Second, § 402A (1965).

A cornerstone of the doctrine of strict liability for product defects is the control of the manufacturer or seller. It has been observed, "[t]he plaintiff must prove (1) that the product was in defective condition when it left the possession or control of the seller...." *Ransome v. Wisconsin Elec. Power Co.,* 87 Wis.2d 605, 275 N.W.2d 641, 647 (1979). " '[T]he manufacturer has the greatest ability to control the risk created by his product since he may initiate or adopt inspection and quality control measures thereby preventing defective products from reaching the consumer.' " *Ransome,* 275 N.W.2d at 647. Without control of the product as delivered, that doctrine should not be applied.

While some cases declare § 402A to be applicable to the sale of electricity through such a distribution system, such cases often have recognized a distinct basis for liability. For example, an uninsulated distribution line in upper branches of a tree frequented by children, *Petroski v. Northern Indiana Pub. Service Co.,* 171 Ind. App. 14, 354 N.E.2d 736 (1976); a failure in distribution line maintenance, *Ransome;* and failure to lock and seal circuit breakers and to warn, *Aversa v. Public Service Elec. & Gas Co.,* 186 N.J.Super. 130, 451 A.2d 976 (1982).

The inappropriateness of the application of § 402A to such a sale of electricity is demonstrated by the facts of this case. For an undisclosed period of time, the distribution facilities of the defendant had delivered electricity at the proper voltage. Then, apparently because the neutral wire was down, the jury was permitted to find the defendant was liable. This was true irrespective of cause, whether an act of the plaintiffs or a third party, lightning, windstorm, earthquake or a cause not even visualized. In *Ransome,* it is declared the power company is not an insurer. Yet, liability predicated upon § 402A makes it such.

The generation of electricity in a power plant may be compared to the manufacture of a product. But, there comparison ends. The premise that "[o]rdinarily, electricity leaves the control of the Wisconsin Electric Power Company at the point in the distribution system where a customer's conductors are connected to the company's conductors, namely, at the electric meter" is not compatible with reality. *Ransome,* 275 N.W.2d at 643. Upon leaving the power plant, even though placed in the most perfect distribution system it is possible to

construct, electricity is no longer within the control of seller. The distinction has been succinctly recognized. "We agree that electricity itself is a product, but conclude that its distribution is a service." *Smith v. Home Light and Power Co.*, 695 P.2d 788, 789 (Col.App.1984). Section 402A and MAI 25.04 (1981), "Verdict Directing—Strict Liability—Product Defect" are not applicable. *Smith v. Home Light and Power Co.*, supra. Cf. *Elgin Airport Inn v. Commonwealth Edison Co.*, 89 Ill.App.2d 138, 59 Ill.Dec. 675, 432 N.E.2d 259 (1982).

However, I agree that the plaintiffs did not make a submissible case upon the issue of causation. For that reason, the judgment should be reversed.