Ralph A. NELSON, by Marjorie Nelson, Guardian, Respondent,

v.

Frankie GRICE and Frances Grice, Appellants.

No. 51883.

Supreme Court of Missouri, Division No. 2.

Jan. 9, 1967.

Motion for Rehearing or to Transfer to Court En Banc Denied Feb. 13, 1967.

Neale, Newman, Bradshaw, Freeman & Neale, Flavius B. Freeman, Warren S. Stafford, Thom G. Field, Springfield, for respondent.

Wear, Wear & Coffman, William A. Wear, Paul R. Coffman, Springfield, for defendants-appellants.

STOCKARD, Commissioner.

Frankie Grice and Frances Grice (hereafter referred to as the "Grice Sisters" or "defendants") are the owners of a tract of land approximately 330 feet square located on the northwest corner of Glenstone and Chestnut Street Trafficway in the City of Springfield. In August 1963, the Grice

Sisters leased to Ralph A. Nelson part or all of this property (this being one of the disputed issues) to be used for the operation of a grocery store for an original term of thirty-one months ending on March 1, 1966. In the lease agreement the property was described as follows:

"A certain store building known as 723 Glenstone and located at the Northeast corner, consisting of approximately 4,354 square feet of floor space together with the area adjacent to the building which is also covered by this lease and which Lessee and his employees and customers may use for ingress and egress and for parking facilities (the legal description of which property shall be furnished by Lessors.)"

The rent for the "building and premises" was stated to be two percent "of the gross sales of Lessor [sic] resulting from the operation of a grocery and market at the leased premises."

Mr. Nelson operated a grocery store in the building on the premises subsequent to August 1963, and was assisted by his son James who was then seventeen years of age. According to James, his father took care of the "entire lot" and kept the grass cut and picked up paper. The store building was located on the north side, and most of the building was in the northeast quarter of the lot. The eastern portion of the lot and most of the area south of the building was surfaced for use as a parking area. It appears that there was a driveway immediately west of a portion of the building. The area west of the driveway and the parking area was not surfaced but was covered with grass and trees. In the southwest quarter a surfaced driveway extended from Chestnut Street Trafficway northeastward to the parking area. In December of 1963 or January of 1964, some conversations took place between Mr. Nelson and the Grice sisters concerning remodeling or rebuilding, but because of the incapacity of Mr. Nelson at time of trial, subsequently

mentioned, and the invoking by plaintiff of § 491.010 RSMo 1959, V.A.M.S., commonly called the "dead man's statute," the record, as may be expected in such circumstances, is not as complete as it otherwise would be.

Mrs. Janie Price, who was employed by Mr. Nelson as a checker in the grocery store, testified that in the "winter months" the Grice Sisters came to the store, and Mr. Nelson "mentioned wanting it [the building] remodeled because of it being run down in places, and the Grice Sisters said they would rather build a new one than spend money on that one because it was in such bad shape." During the conversation, according to Mrs. Price, Mr. Nelson "mentioned that the new store would be bigger" than the existing building, and the Grice Sisters, "agreed" that it would, and they also said that they would let Mr. Nelson draw up the plans for the building. Mrs. Price then testified that Mr. Nelson said: "Then, the rent will be the same as this one?" and that the Grice Sisters said "yes, it would be the same as that one, that he had a good business there already and that he would make more money in a larger store, with a bigger volume." She further testified that Mr. Nelson said "that he would like that [to be put] into a contract before he would move into a new store," and the Grice Sisters said "it would have to be a new contract because it would be a different building," and they told him "not to worry about it, they would straighten it out later." Mr. Nelson expressed some concern about his financial ability to stock the larger store, and the Grice Sisters told him that they were "sure he could get the money somewhere, or they would help him."

Work was started on the construction of a new building on April 16, 1964, and the building was completed and ready for occupancy on July 1, 1964. This new building was located in the southwest quarter of the lot owned by the Grice Sisters, and was on that portion which previously had been covered with grass and trees and which had not been used for parking.

During the construction Mr. Nelson conferred with the contractor and made suggestions concerning the new building. The contractor testified that the Grice Sisters told him that the new building was to be for the use of Mr. Nelson, and he heard them say "the more he makes the more we make." At the trial it was stipulated that the construction of this building was commenced on the authority of the Grice Sisters and that it was contemplated that it would be for the use of Mr. Nelson to operate a grocery store.

In the spring of 1964, after the construction of the building was "pretty well along," according to Mrs. Price, the Grice Sisters went to Mr. Nelson at his store and handed him a paper. After he read it, Mrs. Price heard him say, "five hundred dollars," and then say to the Grice Sisters, "You told me I could have this [the new building] the same as this building." Mrs. Price testified that "they," meaning the Grice Sisters, "agreed, and said yes, but the new store would be a bigger store than that one." Mrs. Price testified that at a later time, but prior to June 1964, the Grice Sisters again went to Mr. Nelson at his store and handed him another piece of paper. After Mr. Nelson read it he said: "You come in here—you tell me I can have it the same as this one, then you come in here with five and now six hundred; I told you I couldn't pay five, I know I can't pay this." According to Mrs. Price the Grice Sisters did not say anything in reply, "they were standing there, smiling."

Mr. Glen Price, branch manager of the Associated Wholesale Grocers, arranged for a conference on May, 25, 1964 between the Grice Sisters, Mr. Nelson, Mr. Harry Rishworth, the assistant branch manager of Associated Wholesale Grocers, and himself. The purpose of the conference was to attempt to work out an agreement between Mr. Nelson and the Grice Sisters concerning the rental of the new building. At this conference Mr. Nelson insisted that the agreement between him and the Grice Sisters was that he was to have use of the new building on the same terms as the agreement for the old building, that is, two percent of the gross sales with no minimum, and according to Mr. Price, the Grice Sisters did not deny this. The Grice Sisters said that the reason they wanted to build a new building was because the old building had been condemned and that it would be torn down. Frankie Grice, the only one of the sisters who testified, denied that they had said at any time the old store building had been condemned, and in fact, the building had not been condemned. A proposed new lease agreement was presented by the Grice Sisters. It was on a printed form and proposed a lease from the Grice Sisters to Mr. Nelson for a term of ten years of "8200 Sq. Ft. of building at the Southwest corner of 723 N. Glenstone with acces [sic] to all parking. Minimum rent of $800.00 per month and 2% of gloss [sic] over $40,000 per month." There was also a provision that the lessee should "operate seven day a week with a minimum of ten hours." This is the first evidence of a demand by the Grice Sisters of a minimum rent of $800 per month or that the term be increased. During this conference Mr. Price "suggested several different proposals," none of which was acceptable. The Grice Sisters stated, according to Mr. Price, that they could not rent the new building on the "basis of the old building" because the cost was greater than they had anticipated, and they were financing the building and their banker had told them that they had to have a minimum rent of six hundred dollars a month. No agreement was reached at this conference.

On June 21, 1964, the attorney for Mr. Nelson, wrote the Grice Sisters that the terms for the lease for the new building proposed by them were not acceptable, that "all of us should get together to try to agree on a lease before you proceed further" with the construction of the new building, and that "if a new lease cannot

be mutually agreed upon that is satisfactory to both parties, Mr. Nelson, of course, will expect to keep possession of the premises under the existing lease * * *." After the new building was completed, at the direction of the Grice Sisters the contractor constructed an addition to the new building ninety feet in length consisting of two rental business locations.

On June 22, 1964, Mr. Nelson suffered what was referred to at times in the record as a heart attack, but which the treating doctor defined as a "myocardial ischemia or angina pectoris," and he was absent from the store until the first part of September. On September 16 he had what the doctor referred to as a second "episode" which he diagnosed as "acute anxiety neurosis and hypertension of labile nature," and was again hospitalized. On October 28, he had a "new complaint," and the doctor "assumed" that on October 30, he "passed a kidney stone." While Mr. Nelson was absent from work his son managed the store. In October the Grice Sisters opened their own grocery store in the new building in competition with the store of Mr. Nelson, and were still operating it at time of trial. On November 16, 1964, Mr. Nelson attempted suicide by shooting himself, and the injuries he inflicted resulted in total mental and physical disability.

Mr. Nelson filed suit against the Grice Sisters on October 23, 1964. After the attempted suicide, the petition was amended. Although it was in one count only and was labeled "First Amended Petition for Declaratory Judgment," in addition to a request for a declaration of the rights and interests of the parties in the lease, according to the prayer plaintiff sought to reform the lease agreement to include the entire lot belonging to the Grice Sisters, and to obtain actual and punitive damages for trespass, loss of earnings, and for mental anguish and emotional disturbance which caused the "heart attacks" and the attempt to commit suicide. Trial was had before the court, a jury being expressly waived as to the jury issues. The trial court found that (1) the Grice Sisters had leased to Mr. Nelson "a certain store building referred to in the evidence as 723 North Glenstone and the entire tract of land owned by defendants at the Northwest corner of Glenstone Avenue and Chestnut Street Trafficway;" (2) the Grice Sisters "wrongfully failed to furnish the legal description * * * to said property * * *;" (3) Mr. Nelson was "at all times after the execution of said written lease * * * entitled to possession of said real estate and the improvements located thereon for the term of thirty-one (31) months * * * with an option for two (2) additional terms of five (5) years each, upon the terms and conditions provided for in said written lease agreement;" (4) Mr. Nelson performed all the covenants required to be performed on his part; (5) "the defendants unlawfully, wantonly and maliciously (a) trespassed upon the premises covered by the lease, (b) breached their agreement with plaintiff, (c) took possession of a portion of the land included in said lease, and (d) constructed a new grocery and other buildings upon said land, and thereafter the defendants unlawfully, wantonly and maliciously opened and continued to operate a grocery and super market upon said premises, causing loss of business and damage to plaintiff;" and (6) the defendants "unlawfully, wantonly and maliciously continued to harass and interfere with plaintiff's business and plaintiff's use and enjoyment of the leased premises." Two additional findings pertained to the claim for damages for mental anguish and emotional disturbance.

■ The trial court entered judgment reforming the lease agreement between Mr. Nelson and the Grice Sisters by inserting therein the description of the entire lot owned by the Grice Sisters as the property covered by the lease. We conclude that this was error. The property described in the lease was "a certain store building * * * together with the area adjacent to the building * * *." The building is identified as

"being known as 723 Glenstone and located at the northeast corner [of the lot], consisting of approximately 4,354 square feet of floor space." The "area adjacent to the building" is defined as that area "which Lessee and his employees and customers may use for ingress and egress and for parking facilities (the legal description of which property shall be furnished by Lessors)." It thus appears that two items of property are described as being covered by the lease: (1) the building, which is adequately described to be identified, and (2) the "area adjacent to the building." The legal description that was to be furnished was not the description of the entire lot as the trial court held, but was of the "area adjacent to the building," which the "lessee and his employees and customers" were to use for ingress and egress and for parking facilities. As far as shown by the record, the lessee never requested that legal description, and apparently it was never furnished. However, the property referred to as "adjacent to the building" which may be used for "ingress and egress and for parking facilities" can be otherwise identified, and the failure to furnish the description cannot constitute a basis for the courts to rewrite the lease to include portions of the lot obviously not intended. The language of the lease clearly indicates that less than the entire lot was intended to be covered, and the evidence establishes the limits of what was intended. There were four places of ingress and egress, a driveway immediately to the west of a portion of the building, and a hard surfaced area designed and used for parking and covering a substantial portion of the lot. There was no evidence that the other areas, not surfaced, were essential to or were used for ingress and egress or for parking. Neither is it shown that the other areas were essential to the primary purpose for which the lease was entered into, that is, for the operation of a grocery store. Also, if it had been intended that the entire lot was to have been covered by the lease to Mr. Nelson, no "legal description" would have been needed. Instead, some simple phrase would have been all that was necessary such as "all of Lessors' lot at the Northwest corner of Glenstone and Chestnut Street Trafficway."

Prior to the execution of the lease between Mr. Nelson and the Grice Sisters, the property was leased to Charles Mackey for the operation of a grocery store. He sold the business to Mr. Nelson, and according to Mr. Mackey, a witness for plaintiff, his lease was terminated by agreement, and the Grice Sisters told him to get the attorney for plaintiff to prepare another lease "just like the one" he had. The description of the property in the lease to Mr. Mackey was "4354 Sq. Ft. of building at Northeast corner of 723 N. Glenstone with access to all parking." That description clearly did not include the areas of the lot not covered by the building or used for parking and for avenues of ingress and egress. Another interesting factor concerning the lease to Mr. Mackey, in that it clearly demonstrates that the entire lot was not intended to be covered by that lease agreement (and as noted, the lease agreement to Mr. Nelson was to be "just like" it), was that located on the lot and "attached to the grocery store" building at the rear was an apartment building which was used by Mr. Mackey, but for its use he paid $50 a month to the Grice Sisters in addition to the rent provided for in the lease.

When we consider the language used in the lease agreement, and the purpose for and the background of its execution, we conclude that the property covered was not the entire lot as found by the trial court, but was limited to the store building and areas incident to the operation of a grocery business, and the adjacent area adapted to and used for ingress and egress and parking facilities.

■ The trial court also entered judgment in favor of plaintiff in the amount of $50,000 for (1) "unlawful, wanton and malicious trespass," (2) for defendants de-

nying plaintiff "the use of said leased premises," and (3) for the loss of business and earnings from his grocery business directly resulting from the opening and continued operation by defendants of the new grocery store "on the premises which had been, and then were, lawfully leased to the plaintiff." Judgment for an additional amount of $50,000 as punitive damages was entered "by reason of defendants unlawful, wanton and malicious trespass and defendants unlawful, wanton and malicious breach of said lease agreement." This judgment was based on the previously mentioned findings by the trial court that the lease agreement covered "the entire tract of land owned by the defendants," that defendants trespassed "upon the premises covered by the lease," and that they took possession of "a portion of the land included in said lease" and constructed a "new grocery and other buildings upon said land." Neither the judgment for actual nor for punitive damages can be permitted to stand.

The new building was built on that area of the lot which was not adapted to or used for ingress and egress or for parking facilities, an area which we have concluded was not included in the property leased to Mr. Nelson. Any entry by the Grice Sisters upon land not leased to Mr. Nelson could not constitute a trespass by them as to his possessory interests.

Assuming however, but contrary to what we have previously held, that Mr. Nelson, by reason of the lease agreement, had some possessory interest in that part of the lot upon which the Grice Sisters constructed the new store building, no trespass occurred because the entry and the construction of the building was done with the express consent of Mr. Nelson. In fact, our examination of the record as it now stands indicates to us that the Grice Sisters entered onto the land and constructed the new store building pursuant to an oral agreement with Mr. Nelson whereby they would construct the new building and lease it to him at the same rate of rent, and he in turn would surrender his lease on the old building so it could be torn down, and he would operate his grocery store in the new building. Under these circumstances the entry onto the land by the Grice Sisters and the construction of the building could in no event constitute a trespass imposing civil liability. Griesenauer v. Emsco Corporation, Mo. App., 399 S.W.2d 147; 87 C.J.S. Trespass § 49. "Where defendant's authority or license [to enter the land] was from plaintiff, an abuse of it does not make one a trespasser ab initio. Thus, one who enters realty under an agreement or license does not become a trespasser ab initio by failure to perform the agreement according to its terms, or by exceeding the terms of the license, or by failing to perform an act incident thereto, or by wrongful acts outside the agreement." 87 C.J.S. Trespass § 16. See also 52 Am.Jur. Trespass § 20. The evidence also indicates that after the Grice Sisters constructed the building they violated their agreement by refusing to permit him to use it for the operation of his grocery store therein at the same rate of rent as that provided for the old building, but if so, that is a matter of breach of contract which is not pleaded and which does not form the basis of the judgment of the trial court. It also appears, but this is not clearly established, that after the Grice Sisters opened a grocery store in the new building there was no means of ingress and egress to and from it by customers except over the area leased to Mr. Nelson, and perhaps an interference with his rights under the lease agreement resulted. The judgment which was entered, however, was not based on this, but on trespass in taking possession of and using the land where the new store building was constructed. We conclude and hold that the judgment for $50,000 actual and $50,000 punitive damages for trespass must be reversed.

We turn now to a consideration of the award by the trial court in the amount of $200,000 for, as stated in the judgment,

"actual damages for the mental anguish directly resulting from the unlawful, wanton and malicious trespass which directly caused the heart attacks and attempted suicide * * * and for the expenses and loss of earnings directly resulting therefrom, and for the total and permanent mental and physical disability which * * * resulted from said suicide."

It is clear that this judgment for damages for mental anguish was based on the findings by the trial court that the Grice Sisters trespassed on property leased to Mr. Nelson when they constructed the new building and operated therein a grocery store, and that the mental anguish, and its effects, resulted from that trespass. However, it is interesting to note that the only testimony of causation was the expert testimony of Dr. David Hall, the treating doctor, who expressed an opinion based on a hypothetical question, and in that question the conclusion of a trespass or the facts contended to constitute a trespass were not mentioned. Instead the doctor was asked to assume a breach of an agreement by the Grice Sisters to build a new store for Mr. Nelson and to rent it to him at two percent of the gross sales, and to assume "these business problems caused by the defendants." Also, while the doctor testified that in his opinion "it [referring to the "business problems"] certainly caused his attacks," he also said, "I don't know why he committed suicide." However he later said that he had an opinion as to whether "this caused him to attempt to commit suicide," and the inference is that the doctor thought the "business problems" was a contributing cause.

In his brief plaintiff argues that the Grice Sisters "acted with wantonness, maliciousness and fraud, throughout their entire course of conduct by: (1) harassing respondent with increasing demands for new and unconscionable rental rates, (2) constructing other buildings on respondent's premises, (3) trespassing in respondent's office and looking through respond-

ent's papers, (4) interfering with the compressors in order to cause loss of merchandise, (5) driving their vehicle into the vehicle of respondent's young son, (6) threatening to take over and 'run' respondent's business, (7) blocking driveways to respondent's business with their motor vehicles, (8) refusing to furnish the legal description of the premises, (9) refusing to cease construction of the buildings, and (10) operating a super market in competition with respondent on the premises leased to respondent." Since this is a court tried case, and in view of the scope of our review, we shall briefly discuss these matters.

As previously noted we have concluded that the new buildings were not constructed on land leased to Mr. Nelson, but the record does indicate a breach of an oral agreement by the Grice Sisters. As to item (1), assuming the breach of agreement, the evidence does not establish that the rent proposed by the Grice Sisters was "unconscionable." Items (2), (9) and (10) are based in part upon the erroneous contention that the new building was constructed on land leased to Mr. Nelson. As to items (4), (5) and (7), assuming they are supported in the evidence, the incidents all occurred after the attempted suicide and could not have been a proximate contributing cause of the mental anguish and the claimed results. Items (3) and (6) refer to an incident between the Grice Sisters and Mr. Nelson's son which occurred after the first "attack," and there is no evidence whatever that Mr. Nelson ever knew of the incident. As to item (8), there is no evidence that a request for the description was ever made by or on behalf of Mr. Nelson.

We see no occasion to review at length the law concerning the right to recover damages for mental anguish and emotional distress and for the physical effects resulting therefrom. Cases are collected in the annotation at 28 A.L.R.2d 1070. In Pretsky v. Southwestern Bell Telephone Company, Mo., 396 S.W.2d 566, this court thor-

oughly examined the applicable rules, and in discussing the right to recover damages for emotional distress and for bodily harm resulting therefrom, quoted from the Restatement of the Law of Torts, Second, 1965, Vol. I, § 46, which we shall again set out.

"§ 46. Outrageous Conduct Causing Severe Emotional Distress

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and if bodily harm to the other results from it, for such bodily harm.

\* \* \* \* \* \*

"d. *Extreme and outrageous conduct.*

The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' "

Aside from the fact that we have serious doubt concerning the sufficiency of the evidence to establish causation, we shall sum up our conclusions concerning the award of $200,000 for "mental anguish" as follows: (1) The trial court specifically based this award upon the theory that the construction of the new buildings and oper-

ation of the grocery store was done on land leased to Mr. Nelson and that those acts constituted willful and wanton trespasses which caused "mental anguish," but we have concluded that under the factual situation of this case those acts did not constitute a trespass. (2) Other than the contended acts of trespass as above set out, the evidence does not establish such "extreme and outrageous" conduct from which it may be found that the Grice Sisters should respond in damages for emotional distress or mental anguish, and the alleged results therefrom. For these reasons the judgment is reversed.

The remaining portion of the judgment which we must consider is that part by which the Grice Sisters are "enjoined from operating a grocery or super market, or renting or leasing the above described leased premises or any portion thereof, to any other party for any purpose during the term of said lease or during any extension thereof by reason of the exercise by plaintiff of his option rights under said lease." The phrase, "above described leased premises" refers to the entire lot owned by the Grice Sisters.

For the reasons previously set out, the injunction as worded cannot be permitted to stand. However, we do not conclude that plaintiff necessarily was not entitled to any relief whatever. He did have a valid lease on a substantial portion of the lot, and apparently, although the evidence does not clearly establish this, the Grice Sisters used the avenues of ingress and egress and the parking lot which they had leased to Mr. Nelson as an adjunct to their grocery store so they could operate it in competition with Mr. Nelson. But relief in this respect was not requested, and was not granted, and the record as it now exists does not justify an attempt on our part to modify the injunction. Also, the original term of the lease has now expired, and we do not know whether Mr. Nelson exercised his option to extend the lease, if there was in fact an enforceable option in view of the peculiar language in the lease agreement.

Therefore, the entitlement to other injunctive relief, if any, must depend upon subsequent developments concerning pleadings and proof.

■ Civil Rule 83.13, V.A.M.R., provides for the outright reversal of an improper judgment "unless justice requires otherwise." " 'The furtherance of justice requires that a case should not be reversed without remanding unless the appellate court is convinced that the facts are such that a recovery cannot be had; and even though the plaintiff fails to substantiate the theory upon which his case was tried, if he nevertheless shows a state of facts which might entitle him to recover if his case were brought upon a proper theory, the judgment will not be reversed outright, but instead, in the exercise of a sound judicial discretion, the case will be remanded to give him the opportunity to amend his petition, if so advised, so as to state a case upon the theory which his evidence discloses.' " East v. McMenamy, Mo., 266 S.W.2d 728, 732; Yarrington v. Lininger, Mo., 327 S.W.2d 104, 111. We note that the Grice Sisters filed a counterclaim which was dismissed by the trial court, and on this appeal that action is not challenged. Ordinarily, that portion of the judgment would be affirmed. However, in the counterclaim the Grice Sisters pleaded the existence of an oral agreement but with different terms than that indicated by plaintiff's evidence. In the exercise of judicial discretion, we conclude that the entire judgment should be reversed.

The judgment is reversed and the cause remanded.

BARRETT, C., not sitting.

PRITCHARD, C., concurs.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.