Ronald M. and Erline DeLONG,
Respondents,

v.

OSAGE VALLEY ELECTRIC COOPER-
ATIVE ASSOCIATION, Appellant.

No. WD 36984.

Missouri Court of Appeals,
Western District.

July 22, 1986.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 28, 1986.

Application to Transfer Denied
Oct. 14, 1986.

Craig S. Johnson (argued), Jefferson City, for appellant.

Kenneth M. Dake (argued), Robert B. Reeser, Jr. (argued), Sedalia, for respondents.

Before NUGENT, P.J., and SHANGLER and MANFORD, JJ.

NUGENT, Presiding Judge.

Defendant Osage Valley Electric Cooperative Association appeals from a verdict for plaintiffs Ronald and Erline DeLong in an action for wrongful termination of electrical service and from a directed verdict against defendant on its counterclaim for conversion. We reverse and remand the entire case for new trial.

Plaintiffs, Robert and Erline DeLong rented a three bedroom fully electric home located on Teal Bend in Benton County, Missouri. In October, 1982, plaintiffs applied for and received membership in the Osage Valley Electric Cooperative Association entitling them to electrical service. Plaintiffs regularly paid their electricity bills until this dispute arose.

On March 23, 1983, plaintiffs reported to defendant that overnight their meter had registered some 16,000 kilowatt-hours. Plaintiffs were told that a truck would be out to check the meter and that if anything was wrong with the meter defendant would adjust their bill accordingly. The cooperative replaced the meter with another and sent the suspect meter to be tested for accuracy.

On March 31, 1983, plaintiffs received a bill in the amount of $321.84,[1] a sum con-

---

1. This amount was for one half the total kilo-   watt hours registered from the meter which had

siderably higher than the bills plaintiffs had been paying. Plaintiffs immediately contacted Mr. Jim Hacker, defendant's general manager, regarding this unusually high bill. They told him that it was impossible for them to have used that much electricity and that they would not pay the billed amount. Mr. Hacker told plaintiffs that the meter had been tampered with and that they had to pay the entire bill, an amount over $600, plus a $1,000 deposit for continued service before closing time that day, otherwise service would be disconnected. Plaintiffs denied tampering with the meter and told Hacker that they would be unable to come up with that amount of money before closing time.

Plaintiffs then contacted attorney Robert Drake. He telephoned Mr. Hacker to see if he could do anything to prevent disconnection of plaintiffs' electricity. Mr. Hacker told Mr. Drake that the meter had been tampered with, that plaintiffs used the amount of electricity registered on the meter and that they would have to pay the entire sum plus the special deposit that day. The lawyer telephoned Mr. Hacker a second time in an effort to settle the matter, but he was unresponsive to alternative measures and told Mr. Drake that a truck had already been sent to remove the meter. Plaintiffs returned home that afternoon and found that their electricity had been disconnected. They tried to salvage what freezer goods they could by storing them elsewhere; the rest, about $100 worth of venison and milk products, spoiled. The next day an order was issued enjoining defendant's conduct, and plaintiffs' electricity was restored.

Jim Hacker testified that he had plaintiffs' first meter replaced and tested for accuracy. The tests showed that the meter was measuring electricity within the two per cent range of accepted tolerance. Donald Bennett, defendant's special meter man, who testified to the tampered condition of the meter, said that he found the

been replaced. Normal billing procedures, allow customers until the 12th of each month to

meter to be accurately registering electricity. When Mr. Hacker learned that the meter had been tampered with, he had plaintiffs billed for half the total kilowatt-hours registered on the meter, the remainder to be billed the following month.

Mr. Hacker testified that under the Cooperative's meter reseal policy he could disconnect electrical service without notice to the customer where someone has tampered with a meter. Under that policy, a special deposit of $100 is required of the customer for continued service. He denied demanding that plaintiffs pay the entire sum for electricity used in addition to a $1,000 deposit. He quoted plaintiffs a figure of $1,000, which included the special deposit, all electricity used, as registered on the meter, the cost of installing another meter, and general investigation costs. He ordered plaintiffs' service terminated because plaintiffs said that they would not pay for the electricity registered on the meter.

### I.

Point I of defendant's brief asserts that the trial court erred in overruling its motion for a directed verdict, thereby allowing plaintiffs to submit their case in tort and recover damages outside the scope of the pleadings and proof of the case, which established a contractual relationship between the parties. Moreover, defendant claims, the court thereby further deprived defendant of its affirmative defense of anticipatory repudiation.

▉ The plaintiffs sued defendant for wrongful termination of electrical service. In their pleadings and at trial, plaintiffs conceded that their relationship with defendant was contractual. In Missouri, liability in tort may arise out of a contractual relationship. *Helton v. Hake*, 564 S.W.2d 313, 317 (Mo.App.1978). Plaintiffs clearly had an option to sue in tort or for breach of contract. *Morgan v. Wartenbee*, 569 S.W.2d 391, 397 (Mo.App.1978). Plaintiffs chose to sue defendants in tort.

pay their bill.

■ The evidence, viewed in the light most favorable to the plaintiffs, supports an action in tort for the wrongful termination of service. On March 23, 1983, plaintiffs contacted defendant regarding a suspected malfunction of their meter. Defendant replaced the meter and submitted a bill for one-half the amount of the total kilowatt hours registered on that meter. Plaintiffs contacted the defendant stating that they would not pay the disputed billed amount. The defendant normally allows its members twelve days to make a timely payment before adverse measures are taken against the nonpaying member. Defendant demanded payment that day plus a $1,000 deposit, which far exceeded the amounts authorized by defendant's meter reseal policy. Plaintiffs' electricity was disconnected some two hours before the close of that business day. Such evidence is sufficient to support an action for the wrongful termination of plaintiffs' electrical service.

Defendant further argues that the trial court's allowing plaintiffs' case to be submitted in tort deprived defendant of its affirmative defense of anticipatory repudiation. That issue has not been preserved for review.

■ Missouri Supreme Court Rule 78.07 requires that "[a]ny specific objection to instructions which were not made at trial before submission to the jury must be set forth in the motion for new trial to preserve the error for review." Although defendant did raise the issue of the trial court's failure to instruct on anticipatory repudiation in its motion for new trial, the record does not show that defendant ever offered such an instruction. Furthermore, an instruction on the defense of anticipatory repudiation does not appear in the legal file nor is it specifically referred to in the trial transcript. *Duke v. Gulf & Western Manufacturing Co.*, 660 S.W.2d 404, 417 (Mo.App.1983). Accordingly, the point is not preserved for review.

## II.

In Point II of its brief, defendant claims that the trial court erred in sustaining the plaintiffs' motion for directed verdict as to its counterclaim for conversion and in refusing to submit instructions on that claim, which included punitive damages.

On review of a directed verdict on defendant's counterclaim, we must consider all of the evidence in the light most favorable to the counterclaiming defendant, accept as true that which is not entirely unreasonable or opposed to physical laws, accord counterclaimant the benefit of all favorable inferences from the evidence, reject all unfavorable inferences and disregard plaintiffs' evidence except insofar as it aids counterclaimant's case. *Beshore v. Gretzinger*, 641 S.W.2d 858, 862 (Mo.App.1982).

We look to the evidence presented at trial to determine whether defendant made a submissible case on its conversion of electricity theory. Defendant had the duty to establish its claim of conversion by substantial evidence of probative value or by inferences reasonably to be drawn from the evidence.

The evidence was that at the time the meter was removed from the DeLong house the meter man reported that it registered 16,164 kilowatt-hours. The condition of the meter showed signs of tampering; the bayonets and bolts were scratched, the seals were broken and the meter was loose and against the glass. Defendant tested the meter for accuracy and found that it measured electricity within the two per cent range of accepted tolerance. Expert witness James Ledbetter concluded that, based on the evidence, someone had tampered with the meter. He also testified that over the course of five months 16,000 kilowatt hours could be consumed with that meter.

■ Conversion may be proved in one of three ways; (1) by tortious taking; (2) by any use or appropriation to use by the person in possession indicating a claim of right in opposition to the owner's rights; or (3) by refusal to give up possession to the owner on demand. *Time Plans, Inc. v. Wornall Bank*, 419 S.W.2d 491, 495 (Mo.

App.1967). Based on this evidence, a jury could reasonably infer a tortious taking by plaintiffs' tampering with the meter for the purpose of depriving defendant of payment for electricity used.

In their brief, plaintiffs argue that "[defendant] is attempting to bootstrap itself into a position of claiming sufficient evidence to submit this claim by stacking an impermissible inference upon an inference that does not even arise because there was no evidence that [plaintiffs] used the power." We disagree.

> The rule prohibiting the piling of inferences is applied when necessary to guard against attenuated reasoning, as where an initial inference is drawn from a fact, and other inferences are built solely and cumulatively upon the first, so that the conclusion reached is too remote and has no sound logical foundation in fact.

*Marra v. Jones Store Co.,* 170 S.W.2d 441, 450 (Mo.App.1943). Any number of concurrent inferences, however, may be drawn from the same fact or facts and, in a given case, any number of inferences may be drawn so long as each has a factual foundation. *Id.* at 450. The rule is that

> the inference drawn must be reasonable, and may not be arrived at by speculation or conjecture. But neither is the inference to be precluded by speculation or conjecture, or by a mere possibility that the contrary may be true. * * * Probabilities, not possibilities, are controlling. It is not required that an inference be justified beyond all doubt.

*Pipes v. Missouri Pacific Railroad Co.,* 338 S.W.2d 30, 36 (Mo.1960) (en banc), quoting from *Mauzy v. J.D. Carson Co.,* 189 S.W.2d 829, 833 (Mo.App.1945).

Further, the jury may believe all, part or none of the testimony of any witness to the case. *Young v. Kansas City Southern Railway Co.,* 374 S.W.2d 150, 153 (Mo. 1964). A claim should not be withdrawn from a jury "unless the facts in evidence and the legitimate inferences to be drawn from such facts, are so strongly against [the counterclaimant] as to leave no room for reasonable minds to differ." *Abel v. Campbell 66 Express, Inc.,* 378 S.W.2d 269, 271 (Mo.App.1964).

■ In this case, the condition of the meter—its seals broken, the bayonets and bolts scratched and the meter loose and resting against the glass—engenders the inference that someone had tampered with the meter. The fact that the meter in question was the one servicing plaintiffs' house and measured the electrical current they consumed gives rise to the inference that plaintiffs had tampered with the meter. The evidence that this meter measured kilowatt-hours accurately when tested, coupled with evidence that 16,000 kilowatt-hours could have been used within a five month period, supports the inference that plaintiffs used that amount of electricity.[2]

Each inference in this case has been drawn from its own factual foundation. We conclude, therefore, that defendant made a submissible case on its counterclaim,[3] and that defendant is entitled to a new trial on that claim.

■ On the issue of punitive damages, where conversion is established, the party asserting the claim is entitled to actual damages[4] and may recover punitive damages if the conversion is malicious. *Davis v. Nash Central Motors,* 332 S.W.2d 475, 480 (Mo.App.1960). The purpose of punitive damages is to punish wrongdoing and to deter future similar wrongful conduct. *Price v. Ford Motor Credit Co.,* 530

---

**2.** Osage utilizes a turn-around billing system under which they rely on each member accurately to record the amount of kilowattage used each month, saving the expense of sending meter readers throughout the rural area every month.

**3.** The offered but unused instruction "B–2" on conversion failed to instruct the jury to find that plaintiffs tampered with the meter as it should have.

**4.** Defendant offered instruction "B–3" on actual damages for conversion. MAI–4.01. Appropriateness of that instruction is not before us on appeal. Regarding the appropriate instruction for actual damages for conversion, *see Breece v. Jett,* 556 S.W.2d 696 (Mo.App.1977).

S.W.2d 249, 256 (Mo.App.1975). If the jury would find plaintiffs guilty of conversion, the very nature of meter tampering to deprive defendant of payment for electricity used would warrant the giving of an instruction for punitive damages.

■ In light of the evidence adduced at trial, defendant's compulsory counterclaim [5] also served as an affirmative defense to plaintiffs' claim, although we need not and do not hold that it complies with Rule 55.09. The evidence indicated that the defendant was acting in conformity with its meter reseal policy, which permits the termination of service to a customer without notice where the condition of the meter shows that someone has tampered with it. Because plaintiffs' claim and defendant's counterclaim arise from the same occurrence and are sufficiently interrelated, justice requires a reversal of the entire judgment, cf. *Nelson v. Grice*, 411 S.W.2d 117, 126 (Mo.1967), and a new trial of both the plaintiffs' action and defendant's counterclaim.

### III.

The trial court gave Instruction 8, which reads as follows:

Your verdict must be for plaintiffs if you believe:

First, plaintiffs were customers of defendant and were receiving electrical power service; and

Second, defendant terminated such electrical service to plaintiffs' premises; and

Third, defendant's acts in so doing were malicious, willful, or wanton; and

Fourth, the plaintiffs were thereby damaged.

Not in MAI

Plaintiff submitted

Point III of defendant's brief contends that Instruction No. 8 was erroneously based on *Rose v. Missouri Public Service Company*, 586 S.W.2d 767 (Mo.App.1979). According to defendant, the instruction improperly states the law in this case because *Rose* involves a public utility, whereas defendant here is a rural electric cooperative whose terms of service differ from those of a public utility. Defendant also says that Instruction No. 8 is argumentative.

In *Rose*, the court gave an instruction on wrongful termination of electricity identical to No. 8 in this case. However, this court's decision in *Rose* does not focus on that instruction but deals with an additional instruction defining "willful", and "wanton" conduct. *Id.* at 767. We held there that the court did not err in giving an instruction accurately defining words used in the verdict director and in the utility's own rule on which plaintiff's action against the utility was based. *Id.* at 768. The fact that the *Rose* case involved a public utility is irrelevant.

■ Defendant once again argues that plaintiffs' cause of action should have been in contract to allow defendant's service contract and meter reseal policy to control the issues in a breach of contract action. As we have previously stated, plaintiffs were free to file their claim in contract or in tort. Obviously, they chose to sue for the intentional tort of wrongful termination of electricity, pleading that "the defendant wantonly and maliciously disconnected electric service of the plaintiffs." This tort denotes the intentional doing of an act in utter disregard of the consequences. *Ervin v. Coleman*, 454 S.W.2d 289, 291 (Mo. App.1970). The elements necessary to support a verdict for plaintiffs are properly set forth in instruction No. 8.[6]

---

5. Rule 55.32(a), Missouri Rules of Civil Procedure, requires that a "pleading shall state a counterclaim any claim which ... the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction."

6. Instruction No. 8 is not an argumentative statement of plaintiffs' contentions at trial, but in fact is a simple instruction listing the elements necessary to find in plaintiffs' favor pursuant to Rule 70.02(e).

## IV

Defendant's Point IV contends that plaintiffs neither pleaded nor proved any independent and willful tort arising out of the contractual relationship between the parties for electrical service, that instruction No. 4 erroneously stated the law with respect to the degree of malice required to justify punitive damages and that submission of a punitive damages claim against defendant, a public corporation similar to a municipality, is against public policy.

■ Defendant argues that in an action for breach of contract, punitive damages can only be sought if the plaintiffs specifically allege or prove an independent and willful tort arising out of the contractual breach. Defendant cites as authority *Stamps v. Southwestern Bell Telephone*, 667 S.W.2d 12, 14 (Mo.App.1984). The *Stamps* case is not dispositive of the issues in this case and is clearly distinguishable. Unlike *Stamps*, plaintiffs' cause of action was not brought for breach of contract but in tort for wrongful termination of service. Plaintiffs specifically alleged in their petition that defendant "wantonly and maliciously disconnected the electrical service of plaintiffs." Assuming, arguendo, that this claim is insufficiently pleaded, a review of the evidence shows that it has evidentiary support. *Ferguson v. Overhead Door Company of Springfield, Inc.*, 549 S.W.2d 356, 362 (Mo.App.1977). Termination may be wrongful where the amount of electricity used and billed is in dispute, where the payment demanded may not yet be due and where the deposit demanded for continued service far exceeds the amount authorized by the meter reseal policy. *De Salme v. Union Electric Light & Power Co.*, 102 S.W.2d 779, 783 (Mo.App.1937).

■ The fact that defendant is a nonprofit rural electric cooperative does not insulate it from liability in tort. *Id.;* see also concurring opinion in *Hills v. Ozark Border Electric Cooperative*, 710 S.W.2d 338 (Mo.App.1986) citing *Byrd v. Blue Ridge Rural Electrical Cooperative,*

*Inc.*, 215 F.2d 542, 547 (4th Cir.1954); *cert. denied*, 348 U.S. 915, 75 S.Ct. 295, 99 L.Ed. 717 (1955), and *Lamar Electric Membership Corp. v. Carroll*, 89 Ga.App. 440, 79 S.E.2d 832 (1953). Further, Chapter 394 of the Revised Statutes of Missouri relating to electrical cooperatives does not exclude defendant from liability for common law tort and punitive damages.[7] Because an intentional tort has been pleaded and proved, punitive damages may be recoverable.

The trial court submitted Instruction No. 4, defining the term "malicious", which reads as follows:

> Malicious, as used in these instructions does not mean hatred, spite or ill will, as commonly understood, but means the doing of a wrongful act intentionally without just cause or excuse.

MAI 16.01

Plaintiff submitted

Defendant argues that in view of *Sanders v. Daniel International Corp.*, 682 S.W.2d 803 (Mo.1984) (en banc), a higher standard of malice is required in an action for punitive damages. We disagree.

In *Sanders*, the Supreme Court held that MAI 16.01 does not adequately express the appropriate standard of malice for punitive damages in malicious prosecution cases. The court directed that the higher standard, that being actual malice, be required in a malicious prosecution action. The *Sanders* case specifically limits the use of this higher level of malice to malicious prosecution cases. *Id.* at 812–14.

■ This case involves a cause of action for wrongful termination of electrical service where the evidence adduced at trial warranted the submission of an instruction for punitive damages. In a common law intentional tort case such as this, submission of an instruction defining malice in accordance with MAI 16.01 is appropriate.

Point V of defendant's brief alleges error in the court's overruling defendant's mo-

---

**7.** Defendant is not a "municipality" for purposes of immunity from punitive damages as defend-

ant would have us believe. *Chappell v. City of Springfield,* 423 S.W.2d 810, 813 (Mo.1968).

tion for remittitur of the punitive damages verdict. In view of our disposition of this appeal, we need not address the question, but we direct the parties' attention to *Firestone v. Crown Center Redevelopment Corp.*, 693 S.W.2d 99, 110 (Mo.1985) (en banc) ("remittitur shall no longer be employed in Missouri.").

For the foregoing reasons, we reverse and remand for new trial of the entire case.

All concur.