**CENTRAL MISSOURI ELECTRIC COOPERATIVE, Respondent,**

v.

**Richard WAYNE and Ruth Balke, Appellants.**

**No. WD 56762.**

Missouri Court of Appeals, Western District.

March 21, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 2, 2000.

Application for Transfer Denied June 27, 2000.

---

See also 966 S.W.2d 15.

George S. Miller, Christopher L. Heigele, Gladstone, for appellant.

Mark T. Kempton, J. Christopher Spangler, Sedalia, for respondent.

Before Presiding Judge SPINDEN, Judge LOWENSTEIN and Judge ULRICH.

HAROLD L. LOWENSTEIN, Judge.

## FACTS

This appeal stems from both a summary judgment in favor of the respondent, Central Missouri Electric Cooperative (CMEC), on its Petition for Damages for electric power supplied to the Balkes, and a directed verdict in favor of CMEC on Appellants', Richard and Ruth Balke's, counterclaim for damages sustained due to CMEC's wrongful termination of electrical power.

CMEC is a rural electric cooperative. It serves farms, residences, schools, and industries in rural, central Missouri. Richard and Ruth Balke operate a dairy farm in Cole Camp. Richard, age forty-nine, has lived on the farm his entire life. Balke lives there with his wife, three of his four children, and his mother, who has lived on the family farm since 1930. CMEC had supplied electrical power to the Balke farm since 1971.

In 1982, CMEC replaced an existing transformer on the property with a larger transformer because of the expansion of the Balke dairy operation. After the installation, the Balkes began experiencing over-voltage problems, which eventually damaged electrical equipment on their farm. As a result, the Balkes' dairy herd was damaged due to mastitis.

After several years of complaints, on March 2, 1991, CMEC discovered that the transformer, which was installed in November 1982, was transmitting over-voltages. After this discovery, CMEC told Mr. Balke, "We're gonna take that transformer off and we're gonna send it down to Arkansas and get it tested out. If it tests out defective, we're gonna pay you for your losses." Subsequently, it was removed and the transformer was found to be defective.

Months passed without the Balkes' claims resulting from the defective transformer being paid. In January 1992, the Balkes received an unusually low electric bill of only $24.00. When they inquired about the bill to CMEC, they were told that they would not be required to pay any electrical bill until CMEC investigated the low bill issue. Following that conversation, the Balkes did not pay any electric bills nor did they read their meter.

However, on May 27, 1992, CMEC billed the Balkes for service for February through June 1992. In June, 1992, Mr. Balke sent a return letter expressing his dissatisfaction and explaining the financial difficulties the family was experiencing due to the electrical problems. Mr. Balke also sent a statement of his own for the damages caused since 1982 that had never been paid by CMEC.

Upon receipt of Mr. Balkes' letter, CMEC requested by phone that the Balkes meet with the co-op's general manager. Mr. and Mrs. Balke went to CMEC and attended a meeting sometime between June 1 and June 11, 1992. At that time, the general manager stated that the Balkes were good people, CMEC felt bad, and they owed the Balkes damages and should have taken care of the situation a long time ago. Further, the general man-

ager requested that the Balkes talk to CMEC's lawyer, Adam Fischer, to make matters "more legal."

Accordingly, Mr. and Mrs. Balke went to Adam Fischer's office in Sedalia. Mr. Fischer informed the Balkes that CMEC was going to see that the Balkes got paid for their damages, but that it could not be done that day. He further stated that "we can just waiver your power bill and then when you get paid, you can pay us." Fischer assured Balke that it was a deal, and the two men shook hands on the agreement.

From that day on, and for over the next five years, the Balkes never read their meter, never received an electric bill from CMEC, nor did they ever receive a delinquency notice. They were never turned over to a collection agency, and all the while the power supply from CMEC continued unabated. Further, the Chairman of the Board of Directors of CMEC, who was CMEC's designated representative at the trial, admitted that there "must have been some arrangement" in order for this situation to have existed for over five years.

The Balkes filed suit against CMEC on July 2, 1992, because their claims for damages to their dairy business and head, dating back from November 1982 to March 1992, had never been paid. The case went to trial in November of 1996, and resulted in a judgment in favor of the Balkes in the amount of $783,333.00. CMEC then appealed to this court. See *Balke v. Central Missouri Elec. Co-op.*, 966 S.W.2d 15 (Mo. App.1997). This court reversed and remanded that case and a settlement was eventually reached subsequent to the filing of *this* appeal.

However, during the pendency of the appeal by CMEC on the Balkes' judgment for damages to the herd and business, CMEC, through its attorney Adam Fischer, requested that the Balkes sign a "Partial Assignment of Proceeds" that would give CMEC preference over the Balkes' other creditors who would be paid out of

the November 1996 judgment. CMEC threatened to discontinue electric service to the Balke farm unless the agreement was executed. The Balkes refused to sign the assignment due to their belief that they already had an agreement with CMEC, and also due to the fact that this prior agreement had been "in operation" for the past five years. Mr. Balke explained his decision as follows; "We only had so much money and I did not think it was fair to pay the people that caused me the problem before I paid the people that backed me."

On June 2, 1997, CMEC workers appeared on the Balkes' farm and disconnected the electricity supply. The workers however, did not tell the Balkes the electric service to the farm was being shut off.

Although Mr. Balke had requested a reconnection, the Balkes were forced to live with no electricity for over 480 days and their appliances were electric. They had no running water, no stove, no refrigeration for food, no lights, no bathing facilities, etc. One child had to move out of the house due to the condition, while the rest of the family had to borrow from neighbors and depend on creek or rainwater and kerosene lanterns or flashlights. The Balkes' high school aged son had to attempt to do his homework by lantern or flashlight. The family did bring in generators, although they eventually failed due to constant use.

The Balkes' clothes had to be washed in cold water. No air conditioner or fans could be used which lead to mildew collecting. The mildew created a "stench" in the house.

The farm could not operate without electricity to pump water. The cattle had to be moved to neighbors' farms in order for them to get water. Mr. Balkes' sister who had grown up on the farm returned and described the living conditions as "absolutely devastating, humiliating, [and] inhumane."

On July 24, 1997, CMEC filed this suit against the Balkes, alleging that they had refused to pay for electrical service from July 1, 1992 through June 1, 1997. CMEC prayed for approximately $20,000. The Balkes filed an answer containing several affirmative defenses, as well as a counterclaim for wrongful termination of electrical power. Their counterclaim set forth that a prior agreement had been made acknowledging that the Balkes would not have to pay for their electricity until the previous damages had been paid to the Balkes by CMEC. The trial court granted summary judgment to CMEC on its petition for damages for service provided and after commencement of the trial for the Balkes' counterclaim, directed a verdict for CMEC.

## POINTS RELIED ON

■ Appellate review of a directed verdict entails an examination as to whether the Balkes' evidence made a submissible claim of wrongful termination of electrical service when viewing the evidence and reasonable inferences therefrom in the light most favorable to the Balkes. *Parra v. Bldg. Erection Serv.,* 982 S.W.2d 278, 282 (Mo.App.1998). Directing a verdict is a drastic measure and a presumption is made in favor of reversing the trial court's grant of a directed verdict unless the facts and any inferences from those facts are so strongly against the Balkes as to leave no room for reasonable minds to differ as to a result. *Friend v. Holman,* 888 S.W.2d 369, 371 (Mo.App.1994).

## I. DIRECTED VERDICT IN FAVOR OF CMEC ON BALKES' COUNTERCLAIM

The trial court directed a verdict in favor of CMEC at the close of the Balkes' case. The Balkes' argue they presented substantial evidence that established a prima facie case for the tort of wrongful termination of electrical service. They further argue that the trial court erred in concluding that it was essential to their claim to prove that the agreement (that CMEC would not collect utility charges against the Balkes until the liability for the improper transformer and the damages flowing from the service had been determined) between the Balkes and Adam Fischer was a legally enforceable contract.

■ In the case of *Haynam v. Laclede Elec. Co–op., Inc.,* the Supreme Court of Missouri set out the elements for a cause of action for wrongful termination of electrical service. 827 S.W.2d 200 (Mo.1992). The elements are: (1) the defendant is engaged in the discharge of a public enterprise or service, (2) the plaintiffs fall within the class of persons whom defendant was obligated to serve, (3) plaintiffs have performed all conditions precedent entitling them to electrical service, (4) defendant wrongfully refused or neglected to supply such service to the plaintiffs, and (5) the plaintiffs have been damaged. *Id.* at 203, *citing Ellyson et ux. v. Missouri Power and Light Co.,* 59 S.W.2d 714, 716 (Mo.App.1933). The Court went on to hold that absent a contrary provision in a contract, the fourth element could be proven by showing the defendant negligently or intentionally failed to supply the electrical service. *Id.* at 203–04.

■ The trial court granted CMEC's motion for directed verdict on the basis that appellants failed to establish the third and fourth elements of their cause of action. As to the third element (plaintiffs having performed all the conditions precedent entitling them to electrical service), the trial court held that because appellants did not prove a legally enforceable contract existed between Adam Fischer and the Balkes, which would thereby excuse them from having to pay their electric bill, that they failed to perform the condition precedent of paying their electric bill.

Although it was undisputed that the Balkes had not paid their electrical bill for almost five years, this court holds that fact should not in itself result in the legal conclusion that they had not fulfilled all condi-

tions precedent to entitle them to electrical service.

The Balkes produced substantial evidence that there was a "special arrangement" made between the Balkes and Adam Fischer. It is illogical to conclude that although the Balkes had paid no bills, received no bills, received no delinquency notices, nor had they been turned over to a collection agency in *five years,* that there was not some sort of arrangement made with Adam Fischer and that CMEC obviously knew of its existence. Even more substantial is the fact that the Balkes' electric supply was never disconnected in that *five year* time period.

█ It is beyond reason to conclude that no arrangement was made similar to the one the Balkes testified about. The trial court granted CMEC's motion for directed verdict on the basis that even if some arrangement existed, then the Balkes' cause of action failed as they did not prove there was any consideration for the arrangement to make it a legally enforceable contract.

The Balkes' counterclaim was filed as an action for the tort, rather than the breach of contract, of wrongful termination of electrical service because they pled under a willful, wanton and malicious standard and prayed for punitive damages. As a result, there is no requirement of a legally enforceable contract pursuant to the *Haynam* elements listed above. *See Haynam,* supra. If the counterclaim was plead as a contract action, the trial court's result would be correct. However, this counterclaim was plead as a tort, and accordingly, there is no contract requirement.

█ Moving on to the fourth element in the tort of wrongful termination of electrical service, the trial court held there was not substantial evidence admitted to show CMEC intentionally disconnected the Balkes' electricity.

Caselaw has held there is a duty as a matter of law on an electric company to protect its customers from foreseeable damage from failure of electrical service, as consumers dependency upon electric companies is almost total. *See Nat'l Food Stores, Inc. v. Union Elec. Co.,* 494 S.W.2d 379 (Mo.App.1973). Several cases have discussed the "willful and wanton" nature of the termination of electricity. *See Rose v. Missouri Public Service Co.,* 586 S.W.2d 767 (Mo.App.1979); *DeLong v. Osage Valley Elec. Co-op. Ass'n.,* 716 S.W.2d 320 (Mo.App.1986). However, *DeLong* most resembles the situation at hand.

The DeLongs were members of a co-op similar to CMEC. When they complained that there must have been a malfunction in their meter, the co-op replaced the meter and sent the old one to be tested. Subsequently, the DeLongs received a higher bill than normal. When confronted about the high bill, the co-op informed the DeLongs that the meter had been tampered with. As a result, the DeLongs were told they would have to pay half of the outrageously high bill plus a $1,000.00 deposit for continued service by the end of the day or their electricity would be disconnected. The second half of the bill would be due the next month. The DeLongs could not come up with the amount of money needed that day, and despite an attorney's attempt to come to a resolution on the DeLong's behalf, the co-op terminated electrical service two hours before the close of that same business day. The DeLongs' damages were a loss of approximately $100.00 worth of perishable food. The trial court enjoined the co-op's conduct the next day, returning the supply of electricity to the DeLongs.

Although the DeLongs' relationship with their co-op was contractual, the court held that tort liability can arise from such a relationship. *DeLong,* 716 S.W.2d at 322. (citations omitted). The court further stated that the DeLongs clearly had the option to sue in tort or in contract. *Id.* (citations omitted). As a result, a pleading that "the defendant wantonly and maliciously disconnected electric service of the plaintiffs" was proper. *Id.* at 325. The

*DeLong* court went on to state that pled in this manner, the tort of wrongful termination of electrical service "denotes the intentional doing of an act in utter disregard of the consequences." *See id. citing Ervin v. Coleman,* 454 S.W.2d 289, 291 (Mo.App.1970) (overruled on other grounds); *Voss v. Am. Mut. Liability Ins. Co.,* 341 S.W.2d 270, 279 (Mo.App.1960) (citations omitted).

Analogous to the case at bar, it is clear to this court that CMEC intentionally and knowingly disconnected the Balkes' electric service when they were fully aware that at least six people (including one age 87) resided in the house, and that the farm was completely dependent on electricity. CMEC intentionally acted "in utter disregard of the consequences" the Balkes would have to face due to the termination of their electricity, all for the mere benefit of receiving a higher creditor status than the Balkes' other creditors. Furthermore, the Balkes never denied that they would pay the bill once they were compensated for the prior damage suit, and the agreement between Mr. Fischer and Mr. Balke already guaranteed CMEC payment of the bill. However, even more substantial is that the Balkes had no electricity for over 480 days, compared to the few hours the DeLongs were without electricity.

In further support of this position, this court has previously held that "[t]ermination may be wrongful where the ... payment demanded may not yet be due...." *DeLong,* 716 S.W.2d at 326 *quoting De Salme v. Union Elec. Light & Power Co.,* 232 Mo.App. 245, 102 S.W.2d 779, 783 (1937). Adam Fischer made a special arrangement with the Balkes confirming they would not have to pay their electric bill until they received compensation from CMEC related to the previous damages. The Balkes had not received any compensation for those damages when Fischer requested the Balkes' sign the "Partial Assignment of Proceeds." As a result, CMEC intentionally turned off the Balkes' electricity when Mr. Balke refused

to sign the assignment. The termination of electricity occurred prior to receipt of any compensation by the Balkes, as was agreed to pursuant to the terms of the arrangement that had been made between Adam Fischer and Mr. Balke. Moreover, this arrangement had already been "in operation" for the past five years. The fourth element of the tort of wrongful termination of electrical service was met when CMEC intentionally abated the electric supply to the Balke farm.

This court finds that the Balkes' counterclaim was plead as the tort of wrongful termination of electricity, and as such there was no requirement for a legally enforceable contract. Further, there was substantial evidence admitted to show that CMEC intentionally terminated the Balkes' electrical service in violation of their payment agreement previously made with Adam Fischer. The trial court erred in granting respondent's motion for directed verdict, and this point is hereby reversed and remanded for a new trial.

## II. SUMMARY JUDGMENT IN FAVOR OF CMEC

This court's standard of review of summary judgment is essentially de novo. *Rustco Prod. Co. v. Food Corn, Inc.,* 925 S.W.2d 917, 921 (Mo.App.1996). The propriety of the grant of summary judgment is purely an issue of law, and this court need not defer to the trial court's order. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376–7 (Mo. banc 1993).

■ Appellants' second contention on appeal is that the trial court erred in granting summary judgment in favor of CMEC on its petition for past electric services due. Although the Balkes put forth several reasons why the summary judgment was error, this court forms its decision based on their point arguing that respondent did not address nor prove the non-viability of the affirmative defenses. Among others, the Balkes' answer con-

tained the affirmative defenses of estoppel and waiver.

■ Due to CMEC's disregard to address the Balkes' affirmative defenses, it neglected to show that the affirmative defenses failed as a matter of law pursuant to Rule 74.04(c). "[W]here the defendant has raised an affirmative defense, a claimant's right to judgment depends just as much on the non-viability of that affirmative defense as it does on the viability of the claimant's claim." *ITT Commercial Finance Corp.*, 854 S.W.2d at 380.

"Therefore, a claimant moving for summary judgment in the face of an affirmative defense must also establish that the affirmative defense fails as a matter of law." *Id.* "[T]he claimant may defeat an affirmative defense by establishing that any one of the facts necessary to support the defense is absent." *Id.*

CMEC admittedly did not respond to appellants' affirmative defenses listed in their answer. As such, the affirmative defenses' viability was not negated, resulting in a genuine dispute of material facts. Therefore, the trial court's summary judgment was granted in error. The summary judgment of the trial court in favor of CMEC is hereby reversed.

## CONCLUSION

The trial court is reversed on both points. The case is remanded for trial.

All concur.